# EXHIBIT Q

Page 1

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4    -------------------------- )

5    MIGUEL CALZADA,                  )

6        Plaintiffs,                  )

7               vs.                   ) No.

8                                     ) CV 11-01701-DMG(JCGx)

9    TIME WARNER CABLE LLC,           ) VOLUME I

10       Defendants.                  )

11   --------------------------)

12

13

14

15        Videotaped Deposition of MIGUEL CALZADA,

16     taken at 633 West Fifth Street, Suite 1900,

17     Los Angeles, California, commencing at

18     9:40 a.m., Tuesday, November 15, 2011,

19     before Janice Schutzman, CSR No. 9509.

20

21

22

23

24

25   PAGES 1 - 129

Page 8

1      Q.    Whose name was the lease under?

2      A.    Both of our names.

3      Q.    Did you both move in at the same time?

4      A.    Yes.

5      Q.    Did you subscribe to cable service at          09:47AM

6      4567 Willis Avenue.

7      A.    We did.  It was in Ms. Wells-Lipton's name.

8      Q.    Which service did you subscribe to?

9      A.    Both Internet and cable services.

10     Q.    Who was the provider?                           09:47AM

11     A.    Time Warner Cable.

12     Q.    Did Ms. Wells-Lipton remain at 4567 Willis

13     after February 2011?

14     A.    She did.

15     Q.    And do you know if she currently lives         09:48AM

16     there?

17     A.    She does.

18     Q.    Have you ever been a subscriber to Time

19     Warner Cable?

20     A.    I have, yes.                                    09:48AM

21     Q.    When?

22     A.    That would have been when I first moved

23     into 15128, which would have been 2002 or 2003.

24     Q.    When did you cease subscribing to Time

25     Warner Cable at 15128 Sylvan?                        09:48AM

1      A.    I don't remember.

2      Q.    Can you give me a rough approximation?

3      A.    Maybe after a couple years.

4      Q.    Why did you stop subscribing to Time Warner

5    Cable at that time?                                09:49AM

6      A.    I don't remember.

7      Q.    Did you continue to receive cable service

8    at 15128 Sylvan after you personally stopped

9    subscribing to Time Warner Cable?

10     A.    Yes.  Yes.  Under my brother's name.  That   09:49AM

11   brother being Jaime.

12     Q.    And it's your testimony that you don't

13   recall why you stopped subscribing to Time Warner

14   Cable?

15     A.    I don't.                                     09:49AM

16     Q.    Do you have a cell phone number?

17     A.    No, I don't, not currently.

18     Q.    Have you had a cell phone number in the

19   past?

20     A.    Yes.  That number was (818) 968-4268.        09:50AM

21     Q.    During what time period did you use that

22   cell phone number?

23     A.    Let me see.  I believe I canceled the

24   service sometime in March of this year, and I

25   believe I've had it for about nine or ten years.    09:51AM

1     Q.    And why did you cancel your cell phone

2  service?

3     A.    Oh, I was -- I was and am currently

4  unemployed.

5     Q.    So you canceled for financial reasons?    09:51AM

6     A.    Correct.

7     Q.    Is there a phone number for the residence

8  where you currently reside?

9     A.    Yes.

10    Q.    What's that number?                        09:51AM

11    A.    (818) 997-3157.

12    Q.    Has that been the same residence number

13  since you moved into 15128 Sylvan Street?

14    A.    Yes.

15    Q.    Was there a number for the residence at    09:51AM

16  4567 Willis during the two to three months you lived

17  there?

18    A.    There was not.

19    Q.    Have you had your deposition taken before

20  today?                                             09:52AM

21    A.    No.

22    Q.    Have you ever been a party to a lawsuit?

23    A.    No.

24    Q.    Do you understand that the oath that you've

25  taken this morning is the same oath that you would   09:52AM

**EXHIBIT Q**
**Page 374**

Page 12

```
 1        Q.    Do you know how many units you've

 2   completed?

 3        A.    Approximately 45.

 4        Q.    Do you have a major?

 5        A.    Political science.                      09:54AM

 6        Q.    Are you currently employed?

 7        A.    No.

 8        Q.    Who was your last employer?

 9        A.    The Law Offices of Jack L. Mattingly.

10        Q.    How do you spell Mr. Mattingly's last name?   09:54AM

11        A.    M-A-T-T-I-N-G-L-Y.

12        Q.    How long were you employed there?

13        A.    Approximately two years.

14        Q.    Can you give me the date range?

15        A.    I can't.  I don't remember.             09:54AM

16        Q.    When were you last employed by

17   Mr. Mattingly's law office?

18        A.    I believe in February of this year.

19        Q.    Would it be fair to say that you were

20   employed with Mr. Mattingly's law office starting   09:55AM

21   sometime in 2009, if you were employed there for two

22   years?

23        A.    That sounds about right.

24        Q.    What was your position there?

25        A.    I was a -- I answered phones there.      09:55AM
```

**EXHIBIT Q**
**Page 375**

Page 17

1     Q.   Did you discuss the deposition with anyone

2  other than the three gentlemen at the meeting

3  yesterday?

4     A.   No.

5     Q.   Prior to yesterday's meeting, what                10:02AM

6  documents, if any, had you reviewed with respect to

7  your role in this case?

8     A.   I was given the special interrogatories,

9  and I was told to answer those.

10        MR. GREIFINGER:  So again, don't reveal          10:03AM

11  conversations between you and your attorneys.  Be

12  very careful about that.

13        THE WITNESS:  Okay.

14  BY MR. MERRYMAN:

15     Q.   Do you recall when that took place?             10:03AM

16     A.   I may have received them about two months

17  ago.

18     Q.   Have you reviewed any other documents at

19  any time with respect to this case?

20     A.   No.                                             10:03AM

21     Q.   Prior to yesterday, had you reviewed the

22  code section that you referred to earlier in your

23  testimony today?

24     A.   Prior to yesterday, no.

25     Q.   Prior -- strike that.                           10:03AM

**EXHIBIT Q**
**Page 376**

Page 18

1        Other than reviewing interrogatories a

2    couple of months ago and your meeting yesterday,

3    have you reviewed any documents with respect to this

4    case at any time?

5        A.   I may have looked for -- I looked for phone        10:04AM

6    records to see if I could pinpoint the date of the

7    conversation.

8        Q.   Were you able to locate any phone records?

9        A.   No.  No, I wasn't.

10       Q.   Other than the documents you reviewed              10:05AM

11   yesterday and the interrogatories that you testified

12   you reviewed approximately two months ago, at any

13   time have you reviewed any documents with respect to

14   this case?

15       A.   No.                                                10:05AM

16       Q.   Who is responsible for paying the Time

17   Warner Cable bill currently?

18       A.   My brother Jaime.

19       Q.   Do you know for what length of time Jaime

20   has been responsible for paying the Time Warner         10:06AM

21   Cable bill?

22       A.   Since I stopped working.

23       Q.   So Jaime has been responsible for paying

24   the Time Warner Cable bill since approximately

25   February of 2011?                                           10:07AM

**EXHIBIT Q**
**Page 377**

Page 26

1    recorded.

2         Q.   At the time you first spoke to Mr. Lipton

3    about this issue, how many conversations had you had

4    with Time Warner Cable?

5         A.   With a Time Warner Cable employee, maybe      10:20AM

6    about 10 or 15 throughout the course of having cable

7    and Internet services.

8         Q.   Is it your testimony that you'd had

9    approximately 10 to 15 conversations with Time

10   Warner Cable through May of 2009 or through today?      10:20AM

11        A.   Through -- I'm not exactly sure how many

12   conversations I've had, but roughly.

13        Q.   Is that through May of 2009 or through

14   today?

15        A.   Through today.                                10:21AM

16        Q.   You can't tell me exactly how many

17   conversations you've had with Time Warner Cable at

18   any time through today; correct?

19        A.   No.

20        Q.   Let me ask the question again.                10:21AM

21             You can't tell me exactly how many

22   conversations you've had with Time Warner Cable at

23   any time through today; is that correct?

24        A.   That's correct, I don't have an exact

25   number.                                                 10:21AM

**EXHIBIT Q**
**Page 378**

1      Q.   As you sit here today, how many calls with

2   Time Warner Cable can you recall?

3           MR. GREIFINGER:  Objection, vague.

4           You can answer.

5           THE WITNESS:  Oh, okay.                    10:22AM

6           I remember the two in question.  I remember

7   the initial -- I remember first ordering it,

8   vaguely, but aside from that, I don't really recall

9   any specific ones.

10  BY MR. MERRYMAN:                                   10:22AM

11      Q.   When you say you remember first ordering

12  "it," are you talking about when you first ordered

13  cable services from Time Warner Cable back in 2002

14  or 2003?

15      A.   That's correct.                           10:23AM

16      Q.   When you first ordered cable service in

17  2002 or 2003, did you speak with a Time Warner

18  customer service representative?

19      A.   I believe so, yes.

20      Q.   Do you recall one way or the other, prior  10:23AM

21  to speaking with that customer service

22  representative, whether you received notice that

23  your call may be monitored or recorded?

24      A.   I don't.

25      Q.   When you refer to the two calls in         10:23AM

**EXHIBIT Q**
**Page 379**

Page 28

1    question, what calls are you referring to?

2         A.   A call in February of 2010 and a call in

3    May of 2009, I believe.

4         Q.   With respect to any calls during which

5    you've spoken to a Time Warner customer service          10:24AM

6    representative, other than the three calls you've

7    identified which are the one when you first ordered

8    service and the calls in May 2009 and February 2010,

9    do you recall one way or the other whether prior to

10   speaking with a customer service representative you      10:24AM

11   received notice that your call may be monitored or

12   recorded?

13        A.   I don't.

14        Q.   You have no recollection one way or the

15   other as you sit here today?                             10:24AM

16        A.   I don't.

17        Q.   Did you at some point hire an attorney to

18   pursue this case?

19        A.   Yes, Mr. Lipton.

20        Q.   When did you hire Mr. Lipton?                  10:25AM

21        A.   I can't give you a specific date, but I

22   would imagine May 2009.

23        Q.   Do you have an agreement with Mr. Lipton

24   regarding his representation of you in this case?

25        A.   Can you be more specific?                      10:25AM

**EXHIBIT Q**
**Page 380**

Page 31

1      Q.   Is there anything else about that code

2  section that you know about?

3      A.   That's about it.  That's the general idea.

4      Q.   When did you decide to file a lawsuit

5  against Time Warner Cable?                          10:30AM

6      A.   It would have been shortly after my call in

7  May of 2009.

8      Q.   Do you know whether there are any other

9  plaintiffs in this case?

10     A.   There -- yes.                               10:31AM

11     Q.   Do you know any of the other plaintiffs?

12     A.   I know a Cheryl Bacca.

13     Q.   Do you know whether or not Jaime Calzada

14  has been a plaintiff in this case?

15     A.   I believe he is.                            10:31AM

16     Q.   How do you know Cheryl Bacca?

17     A.   She was the -- or she was the office

18  manager at the building where I used to work.

19     Q.   Which building is that?

20     A.   5 -- 5900 Sepulveda Boulevard.             10:32AM

21     Q.   Is she still the office manager there?

22     A.   I don't know.

23     Q.   Was she the office manager for the entire

24  building or a particular business in the building?

25     A.   I believe the entire building.             10:32AM

**EXHIBIT Q**
**Page 381**

Page 36

1    Mr. Lipton and this deposition, what else have you

2    discussed with Jaime regarding the status of the

3    litigation at any time?

4        A.   That's about it.

5        Q.   What did you tell Jaime about the                10:39AM

6    deposition today?

7        A.   That it was going to be taking place today.

8        Q.   Did you discuss anything else about the

9    case?

10       A.   No.                                               10:39AM

11       Q.   Did you discuss whether or not Jaime would

12   be deposed?

13       A.   I asked him if he had been deposed already.

14       Q.   What did he say?

15       A.   No.  Or at least I don't believe so.  My         10:40AM

16   understanding was no.

17       Q.   Did you discuss with Jaime whether or not

18   he will be deposed in the future?

19       A.   We wondered it.

20       Q.   When did that discussion take place?            10:40AM

21       A.   Yesterday.

22       Q.   Did you discuss the status of the case with

23   Jaime yesterday?

24       A.   Just that I would be deposed.  That's it.

25       Q.   What is the status of the case?                 10:40AM

**EXHIBIT Q**
**Page 382**

Page 37

1      A.    I don't really understand that.

2            MR. GREIFINGER:  Objection, calls for a

3      legal conclusion.

4      BY MR. MERRYMAN:

5      Q.    You may answer.                              10:41AM

6            MR. GREIFINGER:  You can answer.

7            THE WITNESS:  Pending.  I don't know.

8      BY MR. MERRYMAN:

9      Q.    Do you know anything about the status of

10     the case other than it's pending?                 10:41AM

11     A.    No.

12     Q.    Do you know who the parties to your case

13     are?

14     A.    Time Warner Cable.

15     Q.    Do you know of any other parties to your    10:41AM

16     case?

17     A.    My class.

18     Q.    Anyone else?

19     A.    I believe my brother.

20     Q.    Anyone else that you know of?               10:41AM

21     A.    Cheryl Bacca.

22     Q.    Is there anyone else who you believe to be

23     a party to this case?

24     A.    That's all I remember.

25     Q.    As you sit here today, your understanding   10:42AM

**EXHIBIT Q**
**Page 383**

Page 38

```
 1    is that the parties to this case are you, Jaime

 2    Calzada, Cheryl Bacca and Time Warner Cable; is that

 3    correct?

 4         A.    Specifically, yeah, that's all I remember.

 5         Q.    Do you have an understanding of what claims      10:42AM

 6    for relief you allege against Time Warner Cable?

 7         A.    I don't.  Well -- yeah, I don't.

 8         Q.    As you sit here today, you don't have an

 9    understanding as to what claims for relief you

10    allege against Time Warner Cable; is that correct?    10:43AM

11         A.    Well, I don't understand what "claims for

12    relief" means.

13         Q.    Do you know what the claims that you're

14    alleging against Time Warner Cable are?

15         A.    That I -- that my conversation -- that I    10:43AM

16    wasn't given notice that my conversation would be

17    recorded?  Is that what you mean?

18         Q.    Is that your complete understanding?

19         A.    Yes.

20         Q.    Do you know whether any depositions have     10:43AM

21    been taken in this case other than your deposition?

22         A.    No.

23         Q.    Do you know what documents have been filed

24    with the court in this case?

25         A.    I don't.                                    10:43AM
```

**EXHIBIT Q**
**Page 384**

Page 39

1       Q.   Do you know what documents have been
2   produced by Time Warner Cable to you in this case?
3       A.   I don't.
4       Q.   Do you know what documents you have
5   produced to Time Warner Cable in this case?          10:44AM
6       A.   I don't.
7       Q.   Do you know what documents any other party
8   has produced in this case?
9       A.   No.
10      Q.   Do you know what the procedural posture of   10:44AM
11  this case is?
12      A.   No.
13      Q.   Do you -- strike that.
14           Do you know what relief you're seeking in
15  this case?                                           10:44AM
16      A.   On behalf of the class, I don't really know
17  any specifics.
18      Q.   Do you know what it is you're asking the
19  court or a jury to grant you in relief in this case?
20      A.   No.                                          10:45AM
21      Q.   What class are you asking the court to
22  represent in this case?
23      A.   People who have been recorded without their
24  consent by Time Warner Cable.
25      Q.   What relief are you seeking on behalf of     10:46AM

**EXHIBIT Q**
**Page 385**

Page 40

1    those people from the court?

2        A.   I don't know the specifics of the relief.

3        Q.   Do you know generally what relief you're

4    seeking on behalf of the proposed class from the

5    court?                                              10:46AM

6        A.   I know that there is a statute, I believe,

7    where -- I believe there's a penalty of -- I think

8    it's about $5,000 per call, which violates that

9    rule.  But I don't know specifically -- I don't know

10   anything other than that.                           10:47AM

11       Q.   Do you know of any other relief that you're

12   seeking on behalf of the proposed class from the

13   court?

14       A.   No.

15       Q.   Did you first learn about the possible      10:47AM

16   penalty at your meeting yesterday?

17       A.   Yes.

18       Q.   Prior to yesterday, did you know about the

19   statute that you described and the possible penalty?

20       A.   I knew of a statute, but I didn't know the  10:47AM

21   specifics of it.

22       Q.   What did you know about the statute prior

23   to yesterday?

24       A.   That there was a statute and that there was

25   a penalty.                                           10:47AM

**EXHIBIT Q**
**Page 386**

Page 41

1        Q.    Anything else?

2        A.    No.

3              MR. GREIFINGER:  When you find a convenient

4        time, we've been going over an hour, so can we take

5        a few-minute break?                                    10:48AM

6              MR. MERRYMAN:  Just a couple more

7        minutes --

8              MR. GREIFINGER:  Sure.

9              MR. MERRYMAN:  -- on this line.

10   BY MR. MERRYMAN:                                            10:48AM

11       Q.    When did you learn of the proposed class

12       that you hope to represent?

13       A.    I'm not sure.

14       Q.    Prior to yesterday, did you have an

15       understanding of the proposed class that you hoped    10:48AM

16       to represent?

17       A.    People who had not been -- who had not been

18       given notice that they were being recorded by Time

19       Warner.  That's -- that was my idea, I guess.

20       Q.    And when did you come up with that idea?        10:49AM

21       A.    I don't recall.  I don't know.

22       Q.    Does the proposed class that you hope to

23       represent include people that have called Time

24       Warner Cable anywhere in the country, or is it

25       limited to a particular location?                     10:49AM

**EXHIBIT Q**
**Page 387**

Page 42

1      A.    I don't know.  I don't know.

2      Q.    Does the proposed class of people that you

3    hope to represent include people who have received

4    calls from Time Warner Cable or just people who have

5    called Time Warner Cable?                            10:49AM

6      A.    I don't know.

7      Q.    How do you propose to identify people who

8    are members of your proposed class?

9      A.    I don't know.

10            MR. MERRYMAN:  Okay.  Let's go off the       10:50AM

11   record.

12            MR. GREIFINGER:  All right.

13            THE VIDEOGRAPHER:  Going off the record.

14   The time is 10:49 a.m.

15            (Recess taken.)                              10:50AM

16            THE VIDEOGRAPHER:  Back on the record.  The

17   time is 11:04 a.m.

18            THE WITNESS:  May I?  I'd like to make a

19   correction to one of the questions I was asked.

20            Regarding the documents that I had          11:04AM

21   reviewed, I also reviewed the original complaint as

22   well as the special interrogatories.

23   BY MR. MERRYMAN:

24      Q.    Did you review the original complaint

25   during your meeting yesterday?                       11:05AM

Page 43

```
 1      A.   Yes.
 2      Q.   Had you seen the original complaint before
 3   your meeting yesterday?
 4      A.   I don't recall.
 5      Q.   Do you have email access?                    11:05AM
 6      A.   Yes.
 7      Q.   Have you had email access at all times
 8   since May 2009?
 9      A.   Since May 2009, I believe so, yes.
10      Q.   When you received documents -- strike that.  11:06AM
11           Have you ever received communications from
12   your attorneys in this case by email?
13      A.   No.
14      Q.   Have you received communications from your
15   attorneys in this case by U.S. mail?              11:06AM
16      A.   Yes.
17      Q.   And what have you received by mail from
18   your attorneys in this case?
19      A.   I believe I received the special
20   interrogatories.                                    11:07AM
21      Q.   Have you received anything else by mail?
22      A.   I don't recall.
23      Q.   When did you first meet Mr. Greifinger in
24   person?
25      A.   We met yesterday.  I'm not too sure if I    11:07AM
```

**EXHIBIT Q**
**Page 389**

Page 45

```
 1    case for the plaintiffs, for the class.
 2    BY MR. MERRYMAN:
 3        Q.   Do you know of anyone else who represents
 4    you or the putative class?
 5        A.   No.                                    11:09AM
 6        Q.   Have you done anything other than talk to
 7    your attorneys to learn about the law that applies
 8    to the claims you're making against Time Warner
 9    Cable?
10        A.   No.                                    11:10AM
11        Q.   Have you done anything to learn about facts
12    which might be relevant to your case against Time
13    Warner Cable?
14        A.   No.
15        Q.   What is your understanding of the         11:10AM
16    obligations that you have as a class representative
17    in this case?
18        A.   My understanding is that I'm to protect the
19    interest of the class.
20        Q.   Do you have any obligations as a class    11:11AM
21    representative other than to protect the interests
22    of the class?
23        A.   I believe that's it.
24        Q.   What does that mean, to protect the
25    interests of the class?                          11:11AM
```

Page 46

1        A.    The fiduciary interests of the class.   I

2    believe I'm not supposed to make a deal with the --

3    with any of the attorneys or anything to benefit

4    myself.   I'm supposed to act solely in the interest

5    of the class.                                      11:11AM

6        Q.    What do you understand that you're supposed

7    to do to act solely in the interest of the class?

8        A.    Answer all questions truthfully regarding

9    this case.

10       Q.    Answer all questions truthfully at this    11:12AM

11   deposition or somewhere else?

12       A.    At this deposition or anywhere else.

13       Q.    Do you understand what obligations you may

14   have other than answering questions at this

15   deposition?                                          11:12AM

16       A.    No, not really.   I don't know.   I don't

17   really know my obligations beyond this point.

18       Q.    Other than this case, have you previously

19   served as a class representative?

20       A.    No.                                         11:13AM

21       Q.    Other than this case, have you previously

22   discussed with anyone the possibility of serving as

23   a class representative?

24       A.    No.

25       Q.    Do you know of any individuals who called   11:13AM

**EXHIBIT Q**
**Page 391**

Page 47

1    Time Warner Cable and spoke with a customer service

2    representatives -- strike that.

3            Do you know of any individuals who called

4    Time Warner Cable and spoke to a customer service

5    representative but did not receive notice that his          11:13AM

6    or her call might be monitored or recorded?

7        A.    Other than myself, I know of my brother.

8        Q.    Do you know of anyone else other than you

9    and your brother?

10       A.    No.                                                11:14AM

11       Q.    What is your understanding of calls that

12   your brother has made to Time Warner Cable with

13   respect to whether or not he received notice his

14   call might be monitored or recorded?

15       A.    I know that he made a call in May to cancel       11:14AM

16   services.

17       Q.    May of what year?

18       A.    2009.

19       Q.    What do you know about that call?

20       A.    He made a call to cancel his phone service,       11:14AM

21   I believe.

22       Q.    Did he, in fact, cancel phone service?

23       A.    He asked that it be canceled.  It was later

24   that we received something, a bill in the mail,

25   stating that they were still charging us for that          11:15AM

Page 52

```
 1        Q.    And it's your testimony here today that you
 2   don't know of anyone that's called Time Warner Cable
 3   and received such a notice?
 4        A.    That's correct.
 5        Q.    Do you know of anyone that falls within the    11:21AM
 6   class that you hope to represent in this case?
 7        A.    My -- yes.
 8        Q.    Who?
 9        A.    My brother.
10        Q.    Anyone else?                                   11:21AM
11        A.    No.
12        Q.    And what's the basis for your belief that
13   your brother falls within the class that you hope to
14   represent in this case?
15        A.    He made a call to Time Warner Cable.           11:21AM
16        Q.    Is there any other basis?
17        A.    No.
18        Q.    To be a member of the class that you
19   propose to represent, does it matter whether the
20   caller expected his or her call to be confidential?      11:22AM
21        A.    I don't know.
22        Q.    To be a member of the class that you
23   proposed to represent, would it matter whether the
24   caller to Time Warner Cable called from a public
25   place and was surrounded by people who could hear        11:22AM
```

**EXHIBIT Q**
**Page 393**

Page 53

1    the content of the conversation during the call?

2         A.    I don't know.

3         Q.    To be a member of your proposed class in

4    this case, does it matter whether a proposed class

5    member is a subscriber to Time Warner Cable?          11:22AM

6         A.    I don't know.

7         Q.    Do you know how you would identify a

8    proposed member of your class who has never been a

9    subscriber to Time Warner Cable?

10        A.    I don't know.                              11:23AM

11        Q.    Do you know how you would identify a member

12   of your proposed class who was not a subscriber to

13   Time Warner Cable at the time he or she called?

14        A.    No, I don't.

15        Q.    Do you have an understanding of the         11:23AM

16   compensation you'll receive if you're successful in

17   this lawsuit?

18        A.    I do not.

19        Q.    Do you have any expectation as to what you

20   expect to receive if you're successful in this        11:23AM

21   lawsuit?

22        A.    I do not.

23        Q.    Are you prepared to be responsible for Time

24   Warner Cable's costs if you are not successful in

25   this lawsuit?                                          11:24AM

**EXHIBIT Q**
**Page 394**

Page 54

1      A.    No.

2      Q.    Do you understand that if you're not

3  successful in this lawsuit, you may be responsible

4  for Time Warner Cable's costs?

5      A.    No.                                        11:24AM

6      Q.    Is there an amount of Time Warner Cable's

7  costs that you're prepared to pay if you're not

8  successful in this lawsuit?

9      A.    No.

10     Q.    Are you prepared to pay a single dollar of   11:24AM

11  Time Warner Cable's costs if you're not successful

12  in this lawsuit?

13     A.    I'm -- no.

14     Q.    Do you have an understanding of who's going

15  to pay Time Warner Cable's costs if you're not       11:24AM

16  successful in this lawsuit?

17     A.    I do not.

18     Q.    Have you been told that you will not be

19  responsible for costs if you're not successful in

20  this lawsuit?                                         11:25AM

21     A.    I have not.

22     Q.    Have you had any discussion whatsoever

23  about who would be responsible for costs if you're

24  not successful in this lawsuit?

25     A.    No.                                          11:25AM

**EXHIBIT Q**
**Page 395**

Page 55

1       Q.    Earlier, you identified two calls that you

2   could recall to Time Warner Cable during which you

3   did not receive notice that the call may be

4   monitored or recorded and spoke to a customer

5   service representative.                              11:26AM

6           Do you recall that testimony?

7       A.    Yes.

8       Q.    And those calls you testified you made in

9   May of 2009 and February of 2010; is that correct?

10      A.    It is.                                      11:26AM

11      Q.    How do you recall those two dates?

12      A.    I just do.

13      Q.    Do you recall the specific dates?

14      A.    No.

15      Q.    For example, can you tell me which date in   11:26AM

16  May of 2009 you called Time Warner Cable?

17      A.    I cannot.

18      Q.    Can you tell me which date in February of

19  2010 you called Time Warner Cable?

20      A.    I cannot.                                   11:26AM

21      Q.    If you wanted to figure out which date in

22  May of 2009 you called Time Warner Cable, is there

23  anything you could do to figure that out?

24      A.    Yes.

25      Q.    What would you do?                          11:27AM

**EXHIBIT Q**
**Page 396**

Page 56

1      A.    I believe those dates are in the complaint.

2      Q.    What did you do to figure out the dates so

3   that they could be put in the complaint?

4      A.    Initially when I made the call in May, it

5   was soon after that I spoke with Mr. Lipton, so it          11:27AM

6   was fresh in my memory.

7      Q.    And did you give Mr. Lipton the date?

8      A.    Yes.

9      Q.    Prior to you retaining Mr. Lipton, did he

10   tell you that he was contemplating filing a class          11:28AM

11   action against Time Warner Cable?

12      A.    No.

13      Q.    Prior to you retaining Mr. Lipton, did he

14   tell you that he was aware of other people that had

15   called Time Warner Cable and had not received notice       11:28AM

16   that their call might be monitored or recorded?

17      A.    No.

18      Q.    Prior to your retaining Mr. Lipton, were

19   you aware of any possible litigation against Time

20   Warner Cable for not providing notice that a call          11:28AM

21   may be monitored or recorded?

22      A.    No.

23      Q.    When is the first time you heard about

24   possible litigation against Time Warner Cable?

25      A.    I had not heard of anything.                      11:28AM

**EXHIBIT Q**
**Page 397**

Page 57

1      Q.    Until when?

2      A.    I had not heard of anything.   Just my case.

3      Q.    Prior to speaking to Mr. Lipton, why did

4    you think your call to Time Warner Cable was

5    recorded?                                              11:29AM

6      A.    In my follow-up call to Time Warner, I had

7    been made aware that my call was being recorded

8    after I had asked what sort of records they had in

9    regards to the cancellation of our phone service.

10     Q.    What were you made aware of?                    11:30AM

11     A.    That the phone call was being recorded.

12     Q.    When were you told that?

13     A.    After I had inquired regarding the records

14   regarding canceling my -- the phone service.

15     Q.    So when you say "the record regarding         11:30AM

16   canceling the phone service," you're talking about

17   the records regarding canceling the phone service in

18   Jaime Calzada's name; correct?

19     A.    Correct.

20     Q.    When was the conversation you had with Time   11:31AM

21   Warner Cable in which you were made aware that your

22   calls were being recorded?

23     A.    Can you repeat that?   I'm sorry.

24     Q.    When was the conversation you had with Time

25   Warner Cable during which you were made aware that    11:31AM

**EXHIBIT Q**
**Page 398**

Page 58

1   your calls were being recorded?

2           MR. GREIFINGER:   Objection, misstates his

3   testimony.   "Calls" is plural.

4   BY MR. MERRYMAN:

5       Q.   You may answer.                              11:31AM

6       A.   Oh, in May of 2009.

7       Q.   What specifically were you told by Time

8   Warner Cable regarding the recording of calls during

9   that conversation?

10      A.   That all -- I believe that all calls were    11:31AM

11  recorded.

12      Q.   Who told you that?

13      A.   I don't remember.

14      Q.   Was -- were you told that in May of 2009 by

15  a Time Warner Cable customer service representative?   11:32AM

16      A.   I'm sorry.   I was told that that call was

17  being recorded.

18      Q.   Which call?

19      A.   My call with the customer service agent.

20      Q.   What specifically were you told?             11:32AM

21      A.   I don't remember specifically.

22      Q.   During your call in May 2009, were you

23  informed that your call was being recorded by

24  recorded notice or by the customer service

25  representative with whom you spoke, or both?          11:33AM

**EXHIBIT Q**
**Page 399**

Page 59

1      A.    I was not given notice by a recording.   I

2  was given notice by the customer service rep after I

3  had inquired about the phone bill.

4      Q.    What specifically did the customer service

5  representative tell you about the recording of          11:33AM

6  calls?

7      A.    All I remember is that she said that my

8  call was being recorded.

9      Q.    Did she tell you that the call that you

10 were in the process of having was being recorded?       11:33AM

11     A.    I don't recall.

12     Q.    Did -- was it a man or a woman with whom

13 you spoke?

14     A.    I believe it was a woman.

15     Q.    Did she tell you that the prior call         11:34AM

16 regarding the cancellation of phone service had been

17 recorded?

18     A.    Yes.

19     Q.    Did she tell you that Time Warner Cable

20 records all calls?                                       11:34AM

21     A.    I don't recall.

22     Q.    Did she explain to you in May 2009 Time

23 Warner Cable's policy with respect to recording

24 customer service calls?

25     A.    I don't recall.                               11:34AM

Page 60

1 Q. As of May 2009, you understood that Time

2 Warner Cable records customer service calls; is that

3 correct?

4 A. No.

5 Q. As of May 2009, you understood that Time 11:35AM

6 Warner Cable records at least some customer service

7 calls; is that correct?

8 A. I -- specifically, the call that I -- my

9 brother made.

10 Q. As of 2009, you understood that Time Warner 11:35AM

11 Cable records at least some customer service calls;

12 is that correct?

13 A. That is correct.

14 Q. So as of May 2009, if you called Time

15 Warner Cable, you understood that it was possible 11:35AM

16 that a customer service call could be recorded;

17 correct?

18 A. No.

19 Q. As of May 2009, you were told that certain

20 customer service calls had been recorded.  That's 11:36AM

21 correct?

22 A. That my brother's had been recorded.

23 Q. And that when you were speaking to a

24 customer service representative in May of 2009, you

25 were told that the call that you were on was being 11:36AM

Page 61

```
 1    recorded; is that correct?

 2         A.    I don't recall.

 3         Q.    Did you ask the customer service

 4    representative whether the call that you were on was

 5    being recorded?                                    11:36AM

 6         A.    I don't recall.

 7         Q.    So you may have been told it was being

 8    recorded or you may not have, you just don't recall

 9    as you're sitting here today; is that correct?

10         A.    I don't recall.                         11:36AM

11         Q.    You don't recall one way or the other;

12    right?

13         A.    Correct.

14         Q.    As of May 2009, you knew that Time Warner

15    Cable had recorded at least some of its customer     11:37AM

16    service calls; is that right?

17              MR. GREIFINGER:   Objection, asked and

18    answered.

19    BY MR. MERRYMAN:

20         Q.    You may answer.                          11:37AM

21         A.    Correct.  I knew of my brother's.

22         Q.    You knew that your brother had called

23    888-TW-CABLE for the call that you had been told was

24    recorded; correct?

25         A.    Correct.                                 11:37AM
```

**EXHIBIT Q**
**Page 402**

Page 65

1    than a call on February 6, 2010?

2        A.    Specifically, no.

3        Q.    I believe you testified earlier that any

4    calls you've made to Time Warner Cable, other than

5    the calls on May 27, 2009, and February 6, 2010, you          11:44AM

6    don't recall one way or the other whether you

7    received notice that your call may be monitored or

8    recorded; is that correct?

9        A.    I don't recall my answer.

10       Q.    Is your testimony that you know the call           11:44AM

11   you made to Time Warner Cable on May 27, 2009, was

12   recorded because the customer service representative

13   with whom you spoke told you that it was being

14   recorded?

15       A.    I don't recall.                                    11:45AM

16       Q.    As you sit here today, you don't recall one

17   way or the other whether you were told that the

18   May 27, 2009 call was being recorded; is that

19   correct?

20       A.    On the 27th, no, I don't recall.                   11:45AM

21       Q.    What was the purpose of your call on

22   May 27, 2009?

23       A.    To inquire on a bill.

24       Q.    What specifically were you calling to

25   inquire about?                                               11:45AM

**EXHIBIT Q**
**Page 403**

Page 66

1      A.     The cancellation of a service.

2      Q.     What was the issue with respect to the

3   bill?

4      A.     The service was not terminated.

5      Q.     In what respect?                          11:46AM

6      A.     We received an invoice, and it didn't

7   reflect the cancellation.

8      Q.     So were you charged for phone service even

9   though you had called to cancel it?

10     A.     My brother had called to cancel it, yes.    11:46AM

11     Q.     Why did you call instead of Jaime?

12     A.     I don't recall.

13     Q.     During the May 27, 2009 call to Time Warner

14   Cable, did you identify yourself as Miguel Calzada?

15     A.     I believe so.                               11:46AM

16     Q.     Did you inform Time Warner Cable during the

17   May 27, 2009 call that you were not the account

18   holder?

19     A.     I believe so.

20     Q.     When you called to discuss the billing      11:47AM

21   issue on May 27, 2009, did you understand that the

22   customer service representative might have to

23   discuss that issue with someone else in order to

24   resolve it?

25     A.     Yes.                                        11:47AM

**EXHIBIT Q**
**Page 404**

Page 69

```
 1            (The deposition of MIGUEL CALZADA was

 2        reconvened at 12:58 p.m.)

 3

 4            THE VIDEOGRAPHER:  This is the beginning of

 5        disc 2.  We are back on the record.  The time is        12:58PM

 6        12:58 p.m.

 7

 8                  MIGUEL CALZADA,

 9        the witness, having been previously administered an

10        oath by the Court Reporter, testified further as

11        follows:

12

13                  EXAMINATION (CONTINUING)

14        BY MR. MERRYMAN:

15            Q.   Good afternoon, Mr. Calzada.                    01:54PM

16                 Do you understand that you're still under

17        oath?

18            A.   Yes.

19            Q.   From what telephone number did you call

20        Time Warner Cable on May 27, 2009?                       12:59PM

21            A.   It would have been either my brother's

22        phone number or our home phone number, but I'm

23        leaning more towards my brother's phone number.

24            Q.   And your brother's phone number?

25            A.   Is (818) 939-1100.                              12:59PM
```

Page 70

1     Q.   Do you see on line 9 of your interrogatory

2   response, you identify the number as (818) 939-1100?

3     A.   Yes.

4     Q.   Is that the number you called from, to the

5   best of your recollection?                              12:59PM

6     A.   Yes.

7          May I?  I'm noticing an error here on

8   line 11.  It should read -- instead of 996-4268, it

9   should read 968-4268.  I'm sorry.  I missed that.

10     Q.   Why did you call Time Warner on May 27,      01:00PM

11   2009, from your brother's cell phone number?

12     A.   I don't remember.

13     Q.   Did you call from his cell phone so that

14   Time Warner Cable would think it was Jaime Calzada

15   calling?                                               01:00PM

16     A.   No, I don't believe so.  I -- what may have

17   happened is my land line may not have been working,

18   my best guess, but I don't remember.

19     Q.   Did you have a cell phone --

20     A.   I did.                                          01:01PM

21     Q.   -- on May 27, 2009?

22     A.   I did.

23     Q.   But you chose to use your brother's cell

24   phone to make the call to Time Warner Cable instead

25   of your own; correct?                                  01:01PM

**EXHIBIT Q**
**Page 406**

Page 75

```
 1    with that agent?

 2         A.   After answering those prompts, I was put on

 3    hold, and eventually a customer service person

 4    answered my call.

 5         Q.   How long were you on hold?                      01:07PM

 6         A.   I don't recall.

 7         Q.   Do you have any recollection whatsoever as

 8    to how long you were on hold?

 9         A.   I don't.  I don't.

10         Q.   While you were on hold, did you hear           01:07PM

11    anything?

12         A.   I don't recall anything specific.

13         Q.   Can you recall anything generally playing

14    while you were on hold?

15         A.   There may have been advertisements for Time    01:08PM

16    Warner services.

17         Q.   Do you recall whether or not there were ads

18    one way or the other on the May 27 --

19         A.   I don't.  I don't.

20         Q.   While you were on hold on the May 27, 2009     01:08PM

21    call, did you hear an automated recording state that

22    your call may be monitored or recorded by

23    supervisory personnel?

24         A.   No.

25         Q.   And you're sure of that even though you        01:08PM
```

**EXHIBIT Q**
**Page 407**

Page 76

1   can't recall one way or the other whether or not

2   there were advertisements playing during -- while

3   you were holding?

4         MR. GREIFINGER:  Objection, argumentative.

5   BY MR. MERRYMAN:

6         Q.   Is that your testimony?

7         A.   Yes.

8         Q.   So as you sit here today, you can't recall

9   whether or not, while you were on hold, there was

10  silence or there was something playing; is that        01:08PM

11  correct?

12        A.   Correct.

13        Q.   After the agent answered your call, what

14  did you discuss?

15        A.   The bill in question.                        01:09PM

16        Q.   Anything else?

17        A.   I don't believe so.

18        Q.   During that call, did you resolve the

19  billing issue that you had called about?

20        A.   I believe so.                                01:09PM

21        Q.   How was it resolved?

22        A.   I believe I was given instructions on

23  contacting AT&T.

24        Q.   What was the purpose of contacting AT&T?

25        A.   To see whether or not it was their duty to   01:09PM

**EXHIBIT Q**
**Page 408**

Page 77

1    shut off the phone services or not.

2        Q.    Whose duty?

3        A.    AT&T's.

4        Q.    Did you resolve the issue regarding the

5    charges that you did not think were proper on your        01:10PM

6    bill during that call?

7        A.    I believe so.

8        Q.    How was that issue resolved?

9        A.    I'm not sure.  I'm not sure.  I'm not sure

10   if I contacted AT&T and they resolved it or Time          01:10PM

11   Warner took care of it.  But I do remember being

12   sent to -- being asked to call AT&T.

13       Q.    How long did your call with the customer

14   service representative last?

15       A.    A few minutes, I would guess.                   01:10PM

16       Q.    Do you recall or are you guessing?

17       A.    I don't recall.

18       Q.    Do you know one way or the other whether

19   your call on May 27, 2009, was recorded by Time

20   Warner Cable?                                             01:11PM

21       A.    I don't recall.

22       Q.    As you sit here today, do you know whether

23   or not your call with Time Warner Cable on May 27,

24   2009, was recorded?

25       A.    I believe it may have been.                     01:11PM

**EXHIBIT Q**
**Page 409**

Page 78

1      Q.    What's the basis for your belief?

2      A.    I believe I was told by, I believe, my

3   attorneys that --

4           MR. GREIFINGER:  Don't.

5           THE WITNESS:  No?  Okay.                    01:12PM

6           MR. GREIFINGER:  No, no.

7           THE WITNESS:  I don't know.  I don't know.

8   I don't recall.

9   BY MR. MERRYMAN:

10      Q.   You don't know one way or the other whether   01:12PM

11   your call with Time Warner Cable on May 27, 2009,

12   was recorded; correct?

13      A.    I don't recall.

14      Q.   And you don't know one way or the other

15   whether your call with Time Warner Cable on May 27,   01:12PM

16   2009, was monitored; is that correct?

17      A.    That's correct.

18      Q.   Do you know one way or the other whether

19   your call with Time Warner Cable on May 27, 2009,

20   was overheard by anyone?                          01:12PM

21      A.    I don't know.

22      Q.   During your call with Time Warner Cable on

23   May 27, 2009, were you concerned that your call may

24   be monitored or recorded?

25      A.    I don't know.                            01:13PM

**EXHIBIT Q**
**Page 410**

Page 79

1       Q.   Did you express any concern to the Time

2  Warner Cable customer service representative during

3  the call?

4       A.   I don't recall.

5       Q.   At what point in time did you realize that    01:13PM

6  your call on May 27, 2009 -- strike that.

7            At what point in time did you realize that

8  you had not been notified that your call may be

9  monitored or recorded by Time Warner Cable?

10      A.   I don't recall.  It was like two years ago.    01:14PM

11 I don't recall.

12      Q.   Did you realize you didn't receive the

13 notice during the call or sometime after the call?

14      A.   It would have been sometime after the call.

15      Q.   And what caused you to think about whether    01:14PM

16 or not you had received the notice?

17      A.   I inquired as to the records they kept for

18 the cancellation of services.  Yeah.

19      Q.   When was that?

20      A.   That was in my conversation on May 27,        01:15PM

21 2009, regarding the conversation my brother had had

22 with Time Warner Cable.

23      Q.   So that was during the May 27, 2009 call;

24 is that correct?

25      A.   Can you repeat that?  I'm not really          01:15PM

**EXHIBIT Q**
**Page 411**

1      Q.   You testified that you also called Time

2   Warner Cable on February 6, 2010; is that correct?

3      A.   Correct.

4      Q.   And it's your testimony that Time Warner

5   Cable did not provide you with notice that the call          01:17PM

6   may be monitored or recorded during that call; is

7   that correct?

8      A.   That is correct.

9      Q.   What was the purpose of your call to Time

10   Warner Cable on February 6, 2010?                            01:17PM

11      A.   To order a pay-per-view event.

12      Q.   What pay-per-view event were you ordering?

13      A.   It was a UFC fight.

14      Q.   Was that UFC No. 109?

15      A.   I believe so.                                        01:18PM

16      Q.   And did you, in fact, order that

17   pay-per-view event?

18      A.   Yes.

19      Q.   Did you order UFC 109 for Jaime Calzada's

20   account?                                                     01:18PM

21      A.   No.

22      Q.   For whose account did you order it?

23      A.   Janice Wells-Lipton.

24      Q.   And what number did you call from to order

25   that event?                                                  01:18PM

Page 82

1      A.    I believe it would have been

2    Ms. Wells-Lipton's phone number.

3      Q.    What's her phone number?

4      A.    (818) 625-8314.

5      Q.    And whose number is (818) 968-4268?          01:18PM

6      A.    That was my cell phone.

7      Q.    As you sit here today, do you know which

8    number you used to order the pay-per-view event?

9      A.    I do not.

10      Q.    Do you recall one way or the other, or      01:19PM

11    you're just not sure?

12      A.    I am not sure, but it would have been from

13    either of those two numbers.

14      Q.    Do you recall whether you spoke to someone

15    during the February 6 call?                         01:19PM

16      A.    Yes.

17      Q.    How did you recall that you made a call on

18    February 6, 2010, for purposes of this lawsuit?

19      A.    I remember watching the fight.

20      Q.    What was the date of the fight?             01:20PM

21      A.    Sometime in February 2010.

22      Q.    How do you recall that you made the phone

23    call on February 6?

24      A.    I would have told my attorney soon

25    thereafter.                                         01:20PM

**EXHIBIT Q**
**Page 413**

Page 85

```
 1        Q.   And did you choose that option?

 2        A.   I did.

 3        Q.   How did you proceed?

 4        A.   I tried to order the pay-per-view event

 5   online, but I believe because of a bill to Time        01:24PM

 6   Warner Cable being paid late, I was -- I was not

 7   able to order the service with the remote, and I was

 8   prompted, a message on my TV screen, to call

 9   TW-CABLE if I wanted to order it.

10        Q.   Is that the call that you then made?         01:24PM

11        A.   Yes.

12        Q.   So how did you proceed during the call with

13   respect to the prompts?

14        A.   As I said earlier, I called the phone

15   number, chose to speak in English, and there was an   01:25PM

16   advert for UFC, and I chose that one.

17        Q.   Did you -- were you able to order the

18   fight, or did you speak to a customer service

19   representative?

20        A.   After selecting that prompt, I was put on   01:25PM

21   hold and I spoke to a customer service agent.

22        Q.   Do you recall what you heard while you were

23   on hold?

24        A.   Specifically, no.

25        Q.   Do you recall generally what you heard      01:25PM
```

**EXHIBIT Q**
**Page 414**

Page 86

1    while you were on hold on February 6, 2010?

2       A.   Yes.

3       Q.   What do you recall hearing while you were

4    on hold?

5       A.   Adverts for Time Warner Cable services.          01:26PM

6       Q.   What specifically did you hear?

7       A.   I don't recall anything specific.

8       Q.   Do you recall how long you were on hold on

9    February 6?

10      A.   I believe it was for more than a few           01:26PM

11   minutes as -- excuse me -- as the customer service

12   agents were very busy or they had a high volume of

13   calls.

14      Q.   Can you recall specifically the content of

15   any of the advertisements you heard while you were     01:27PM

16   on hold on February 6?

17      A.   Specifically, no.

18      Q.   Can you recall generally the content of any

19   of the advertisements you heard while you were on

20   hold on February 6?                                     01:27PM

21      A.   I know that there were advertisements for

22   UFC.

23      Q.   Can you recall anything else you heard

24   while you were on hold?

25      A.   No.                                             01:27PM

**EXHIBIT Q**
**Page 415**

1      Q.    Do you recall whether or not you heard a

2   message that your call may be monitored or recorded?

3      A.    Can you repeat that?  I'm sorry.

4      Q.    Do you recall, while you were on hold on

5   February 6, 2010, whether or not you heard a message      01:27PM

6   that your call may be monitored or recorded?

7      A.    Whether or not, yes.

8      Q.    What do you recall?

9      A.    That I was not.

10      Q.    I'm sorry.  Do you recall that -- strike      01:27PM

11   that.

12          Did you hear a message while you were on

13   hold on February 6 that your call may be monitored

14   or recorded?

15      A.    No.                                            01:28PM

16      Q.    And you're certain about that?

17      A.    Yes.

18      Q.    Why are you certain?

19      A.    Because all I heard was advertisements.

20      Q.    So even though you can't remember the      01:28PM

21   content of the advertisements, you can remember, as

22   you sit here today, with certainty that you didn't

23   receive a notice that your call might be monitored

24   or recorded during several minutes of -- that you

25   were on hold?                                            01:28PM

Page 88

```
 1            MR. GREIFINGER:  Objection, argumentative.

 2    BY MR. MERRYMAN:

 3        Q.   Is that your testimony?

 4            MR. GREIFINGER:  You can answer.

 5            THE WITNESS:  Okay.                    01:28PM

 6            Yes.

 7    BY MR. MERRYMAN:

 8        Q.   Do you know whether or not your call to

 9    Time Warner Cable on February 6, 2010, was recorded?

10        A.   No.                                   01:28PM

11        Q.   Do you have any basis to believe way or the

12    other whether or not your call on February 6, 2010,

13    to Time Warner Cable was recorded?

14        A.   Yes.

15        Q.   What's the basis?                     01:29PM

16            MR. GREIFINGER:  We're invading the

17    province of attorney-client.

18    BY MR. MERRYMAN:

19        Q.   Putting aside conversations that you've had

20    with your attorneys, do you have any independent     01:29PM

21    basis to know or believe one way or the other

22    whether or not your call to Time Warner Cable on

23    February 6, 2010, was recorded?

24        A.   No.

25        Q.   For example, do you believe your call on    01:29PM
```

**EXHIBIT Q**
**Page 417**

Page 89

1    February 6, 2010, may have been recorded because you

2    were told by an agent in 2009 that a call had been

3    recorded?

4       A.   No.

5       Q.   Did you have any concern during your call    01:29PM

6    on February 6, 2010, that your call may be monitored

7    or recorded by Time Warner Cable?

8       A.   No.

9       Q.   It didn't concern you one way or the other.

10   Is that your testimony?                               01:30PM

11      A.   Yes.

12      Q.   At what point did you realize that your

13   February 6 -- strike that.

14           At what point did you realize that during

15   your February 6 call, you had not been notified that  01:30PM

16   your call may be monitored or recorded?

17      A.   After the completion of the call.

18      Q.   Did you say anything to the customer

19   service representative during the call about whether

20   the call was being monitored or recorded or           01:31PM

21   overheard?

22      A.   I don't believe so.

23      Q.   Did you realize during the call itself that

24   you had not received notice that the call might be

25   monitored or recorded?                                01:31PM

**EXHIBIT Q**
**Page 418**

Page 90

```
 1        A.   During the call, no.

 2        Q.   How long after the call did you come to

 3   believe that you had not received notice that the

 4   call might be monitored or recorded?

 5        A.   Shortly thereafter.                    01:31PM

 6        Q.   What does that mean, "shortly thereafter"?

 7   What period of time?

 8        A.   I don't recall a specific amount of time.

 9        Q.   Do you have any recollection whatsoever?

10        A.   Of?  I'm sorry.                        01:31PM

11        Q.   Do you have any recollection whatsoever as

12   to how long after your February 6, 2010 call with

13   Time Warner Cable you came to believe that you had

14   not received notice that your call may be monitored

15   or recorded?                                     01:32PM

16        A.   No.

17        Q.   So you don't recall whether it was an hour

18   later, a day later or two weeks later?

19        A.   Correct.

20        Q.   What do you recall about your conversation 01:32PM

21   with the customer service representative during the

22   February 6 call?

23        A.   What do I recall?  That I ordered the

24   pay-per-view service.

25        Q.   Do you recall anything else?           01:32PM
```

**EXHIBIT Q**
**Page 419**

1        A.    Not being -- not hearing a message that it

2    was being recorded.

3        Q.    What do you recall about the conversation

4    with the customer service representative other than

5    ordering the pay-per-view fight?                          01:33PM

6        A.    I was asked whether or not I wanted the

7    service in HD or standard definition.

8        Q.    How did you respond?

9        A.    I elected HD.

10       Q.    Do you recall anything else from that          01:33PM

11   conversation?

12       A.    No, not really.  It was about more than a

13   year ago, so that's it.

14       Q.    Do you recall discussing with the agent the

15   status of the bill?                                        01:34PM

16       A.    Can you be more specific?

17       Q.    Well, you testified earlier you had to call

18   and speak to the agent because you -- there was --

19   the bill was late so you couldn't order it by

20   remote; is that right?                                     01:34PM

21       A.    Correct.

22       Q.    When you spoke to the agent, did you

23   discuss the status of the bill?

24       A.    Yes.

25       Q.    And did you have a discussion about whether    01:34PM

1  or not you could order the pay-per-view event, given

2  the status of the bill?

3      A.   Yes.

4      Q.   And what do you recall about that

5  discussion?                                           01:34PM

6      A.   I recall having paid the bill a short time

7  before placing the call to Time Warner Cable.

8  And -- yes.

9      Q.   So did you tell the agent that?

10     A.   Yes.                                          01:35PM

11     Q.   And what happened thereafter?

12     A.   She resolved the issue and ordered the

13  pay-per-view for me.

14     Q.   So she decided to allow the pay-per-view

15  event to ordered?                                     01:35PM

16     A.   Correct.

17     Q.   How did you identify yourself to Time

18  Warner Cable during that call?

19     A.   I believe I would have identified myself as

20  Miguel Calzada.                                       01:35PM

21     Q.   Do you recall with certainty one way or the

22  other whether you identified yourself as Miguel

23  Calzada?

24     A.   I do not.  I don't recall whether or not I

25  was asked.                                            01:36PM

Page 93

1     Q.   So you don't recall one way or the other

2   whether you identified yourself as Miguel Calzada;

3   is that correct?

4     A.   I don't recall.

5     Q.   Do you recall anything about the UFC event   01:36PM

6   that you ordered?

7     A.   I remember watching it.

8     Q.   Do you recall anyone that fought during

9   that event?

10     A.   Specifically, no.   01:37PM

11     Q.   Can you recall anything about the event as

12   you sit here today, the pay-per-view event 109?

13     A.   Specifically, no.

14     Q.   Do you recall anything generally about

15   UFC 109?   01:37PM

16     A.   Just that it was a UFC fight.

17     Q.   How do you recall that that's the UFC

18   pay-per-view event you ordered as opposed to some

19   other pay-per-view event?

20     A.   I don't know.   01:37PM

21     Q.   Are you sure that's the UFC pay-per-view

22   event you ordered, or could it have been another

23   one?

24     A.   It was a long time ago, so I don't remember

25   the specific UFC number it was right now.   Yeah.   01:38PM

**EXHIBIT Q**
**Page 422**

Page 94

1      Q.   Have you ordered any other pay-per-view

2   events from Time Warner Cable?

3      A.   No.

4      Q.   So at no time other than this one

5   pay-per-view event have you ordered a pay-per-view        01:38PM

6   event from Time Warner Cable?

7      A.   That is correct.  I believe so.

8      Q.   Do you know the dates -- strike that.

9           Do you know of the dates of any other calls

10   that you personally have made to Time Warner Cable        01:39PM

11   in 2010 or 2011 other than February 6, 2010?

12      A.   Specifically, no.

13      Q.   And I believe you testified that you have

14   never received a call from Time Warner Cable; is

15   that correct?                                             01:40PM

16      A.   I don't remember answering that question.

17      Q.   Have you ever received a call from Time

18   Warner Cable?

19      A.   I have.

20      Q.   When did you receive a call from Time           01:40PM

21   Warner Cable?

22      A.   I don't remember specifically.

23      Q.   Can you remember generally?

24      A.   It would have been during the installation

25   of the cable boxes.                                       01:41PM

Page 95

1      Q.   Which cable boxes?

2      A.   My cable boxes at 15128 and 4567.

3      Q.   When did you have cable boxes installed at

4   15128?

5      A.   I don't recall.                              01:41PM

6      Q.   When did you receive a call from Time

7   Warner Cable regarding the installation of those

8   boxes?

9      A.   I don't recall specifically.

10     Q.   What do you recall about the call that you   01:41PM

11  received?

12     A.    It would have been a call from a technician

13  on behalf of Time Warner Cable to let me know that

14  he was in the area to install the cable boxes.

15     Q.    So the call that you received regarding     01:42PM

16  installation of the boxes at 15128 was from a

17  technician in a Time Warner Cable van who was on his

18  way or her way to your house --

19          MR. GREIFINGER:  Objection --

20  BY MR. MERRYMAN:

21     Q.    -- is that correct?

22          MR. GREIFINGER: -- calls for speculation.

23          THE WITNESS:  I would imagine so.

24  BY MR. MERRYMAN:

25     Q.   And did you receive one or more calls from   01:42PM

**EXHIBIT Q**
**Page 424**

1    the technician that he was on his way?

2        A.    I don't recall.

3        Q.    What about the call or calls you received

4    regarding the installation of boxes at 4567?  Was it

5    a similar type of call or different?                    01:42PM

6        A.    I don't recall.

7        Q.    Did you receive a call regarding the

8    installation of the boxes at 4567?

9        A.    I don't recall whether or not I was present

10   during the installation of the boxes at 4567.          01:43PM

11       Q.    So is it your testimony that you don't

12   recall one way or the other whether you ever

13   received a call from Time Warner Cable regarding the

14   installation of the box at 4567?

15       A.    That is correct.                              01:43PM

16       Q.    So as you sit here today, is it correct

17   that you recall one call from a technician regarding

18   the installation of your cable boxes at 15128 from

19   Time Warner Cable?

20       A.    Correct.                                      01:43PM

21       Q.    Do you recall any other calls from Time

22   Warner Cable to you at any time other than the ones

23   you've just testified about?

24       A.    Right now, I do not.  I do not recall any

25   other than those.                                      01:44PM

**EXHIBIT Q**
**Page 425**

```
 1        Q.   In calling any company's customer service

 2   numbers, have you ever heard a notice that your call

 3   may be monitored or recorded?

 4        A.   I don't recall.

 5        Q.   As you sit here today, can you recall      01:44PM

 6   hearing a notice that a call may be monitored or

 7   recorded from any company that you've called at any

 8   time?

 9        A.   Not specifically, but yes.

10        Q.   What do you recall that you've heard in the 01:44PM

11   past?

12        A.   I remember an automated message, but I

13   don't remember to which company it was, nor the

14   specific date.

15        Q.   Was that recently or sometime in the past?  01:45PM

16        A.   Sometime in the past.

17        Q.   Can you recall hearing such an automated

18   message from one company or a lot of different

19   companies?

20        A.   I don't recall.                            01:45PM

21        Q.   Do you have any recollection, as you sit

22   here today, of an automated message that a call may

23   be monitored or recorded from any company at any

24   time?

25        A.   Not specifically.                          01:45PM
```

**EXHIBIT Q**
**Page 426**

1    Q.   It's -- is it just your recollection that

2   you may have heard one at some point in the past?

3    A.   Correct.

4    Q.   Can you tell me how frequently you hear an

5   automated message that a call may be monitored or    01:46PM

6   recorded when you call a toll-free number?

7    A.   I can't give you an estimate.  I don't --

8    Q.   Do you have a belief as to whether you hear

9   such a message anywhere from zero to a hundred

10   percent of the time when you call a toll-free    01:46PM

11   number?

12    A.   I can't tell you.  I can't give you a

13   specific occasion where it has happened or has not

14   other than these two dates.

15    Q.   Is it your testimony that, other than the    01:47PM

16   two calls that you made to Time Warner Cable on

17   May 27, 2009, and February 6, 2010, you can't recall

18   whether or not you received a message that your call

19   may be monitored or recorded during any of the other

20   calls you've made to toll-free numbers at any time?    01:47PM

21    A.   A specific one, no.

22    Q.   And it's your belief that at some point in

23   the past, you've heard such an automated message,

24   but you can't tell me when or how often, as you sit

25   here today; is that correct?    01:47PM

**EXHIBIT Q**
**Page 427**

Page 99

1      A.    Correct.

2      Q.    Is it possible that you hear these notices

3   that your calls may be monitored or recorded all the

4   time and you just don't recall?

5      A.    No.                                          01:48PM

6      Q.    So you think you rarely hear these, that

7   these types of messages are rarely played when you

8   call a toll-free number.  Is that your testimony?

9          MR. GREIFINGER:  Objection, misstates

10  testimony.                                            01:48PM

11         THE WITNESS:  I can answer?  Okay.

12         I'm sorry.  Can you restate the question,

13  please.

14  BY MR. MERRYMAN:

15     Q.    You've testified that you can't give me a    01:48PM

16  percentage estimate, anywhere from zero to a

17  hundred, as to how often, when you call a toll-free

18  number, you hear an automated message that your call

19  may be monitored or recorded; is that correct?

20     A.    That is correct.                             01:48PM

21     Q.    And you've testified that you don't

22  believe, as you sit here today, that you hear these

23  messages frequently when you call a toll-free

24  number; is that correct?

25     A.    No.                                          01:49PM

**EXHIBIT Q**
**Page 428**

Page 100

1    Q.    So is it your testimony that you may hear

2    these messages frequently when you call a toll-free

3    number, but you just can't recall as you sit here

4    today?

5    A.    Correct.                                              01:49PM

6          MR. GREIFINGER:  Let me object to the

7    previous question as compound.

8    BY MR. MERRYMAN:

9    Q.    Can you tell me with certainty, other than

10   the two calls you made to Time Warner Cable on         01:49PM

11   May 27, 2009, and February 6, 2010, whether or not

12   you received notice that your call may be monitored

13   or recorded during any specific call you've made to

14   a toll-free number and spoke to a customer service

15   representative over the last three years?             01:49PM

16   A.    During a specific call, no.  I don't have a

17   specific call in mind.

18   Q.    When you call a customer service call

19   center and speak to a service agent, do you have an

20   expectation that that agent is going to create a      01:50PM

21   record or take notes concerning your conversation?

22   A.    Not unless I have been told that I would

23   be.

24   Q.    So you don't have an expectation that a

25   customer service representative is making a record    01:50PM

**EXHIBIT Q**
**Page 429**

Page 103

```
 1     speculation, also expert opinion.

 2              THE WITNESS:  Am I to answer?

 3     BY MR. MERRYMAN:

 4        Q.   Yeah.

 5        A.   I don't know.                          01:53PM

 6        Q.   You don't know one way or the other; is

 7     that right?

 8        A.   Correct.

 9              MR. GREIFINGER:  When you come to a logical

10     break, we've been going over an hour, or almost an   01:53PM

11     hour.

12     BY MR. MERRYMAN:

13        Q.   When you call a customer service center,

14     are there certain types of calls that you expect to

15     be confidential and others that you would not expect  01:53PM

16     to be confidential?

17        A.   I expect all calls to be confidential.

18        Q.   What does that mean, to be confidential?

19     Confidential between whom?

20        A.   Between me and the customer service agent.   01:54PM

21        Q.   Well, the two calls that you've testified

22     about on May 27, 2009, and February 6, 2010, you

23     weren't the account holder for either call; correct?

24        A.   Correct.

25        Q.   So it was your expectation, when you made    01:54PM
```

**EXHIBIT Q**
**Page 430**

Page 104

1     those calls, that the content of the call would not

2     be shared with the account holder?

3          A.   I didn't -- I don't know.

4          Q.   Well, is -- was -- is that your

5     expectation, that you would call Time Warner Cable          01:54PM

6     about Jaime Calzada's account and the content of

7     your call would not be shared with Jaime Calzada?

8               MR. GREIFINGER:  Objection, as to -- that's

9     a vague question specifically as to whom would be

10    doing the sharing.  That's a vague question.               01:55PM

11              THE WITNESS:  Yeah, I don't know.

12    BY MR. MERRYMAN:

13         Q.   When you called Time Warner Cable on

14    May 27, 2009, about Jaime Calzada's account, did you

15    have an expectation that anything that was discussed        01:55PM

16    during that call would be shared with Jaime Calzada

17    since it was his account?

18              MR. GREIFINGER:  I'm going to renew the

19    objection, argumentative and vague.

20              THE WITNESS:  I don't know.                       01:55PM

21    BY MR. MERRYMAN:

22         Q.   So is it your testimony that you had an

23    expectation of confidentiality or you don't know

24    whether you've had an expectation of confidentiality

25    when you called Time Warner Cable on May 27, 2009,          01:55PM

EXHIBIT Q
Page 431

Page 105

1    about Jaime Calzada's account?

2        A.    I had an expectation of confidentiality.

3        Q.    And did you have an expectation that the

4    content of your call would not be shared with the

5    actual account holder, Jaime Calzada?                    01:55PM

6            MR. GREIFINGER:  I'm going to renew my

7    objection, vague, vague and ambiguous.

8            THE WITNESS:  I never took that into

9    consideration.

10   BY MR. MERRYMAN:                                          01:56PM

11       Q.    You never thought about that.  Is that your

12   testimony?

13       A.    Yes.

14       Q.    And when you called Time Warner Cable on

15   February 6, 2010, to order a pay-per-view UFC fight      01:56PM

16   on Janice Wells-Lipton's account, did you have an

17   expectation that the content of that conversation

18   would be shared with Ms. Lipton?

19           MR. GREIFINGER:  I'm going to renew my

20   objection, vague and ambiguous.                          01:56PM

21           THE WITNESS:  Again, that was -- I never

22   took that into consideration.

23   BY MR. MERRYMAN:

24       Q.    You didn't think you were going to call and

25   order a fight on Ms. Wells-Lipton's account and she      01:56PM

**EXHIBIT Q**
**Page 432**

Page 106

1    wouldn't find out about it, did you?

2        A.   That was never taken into consideration as

3    she was right next to me.

4        Q.   Okay.  So when you talked to Time Warner

5    Cable on February 6, 2010, Ms. Wells-Lipton was          01:57PM

6    present for your conversation with the company?

7        A.   That is correct.

8        Q.   And during your conversation with

9    Ms. Wells-Lipton on February 6, 2010, she could hear

10   the conversation?                                         01:57PM

11           MR. GREIFINGER:  Calls for speculation,

12   objection.

13           THE WITNESS:  I don't know that.

14   BY MR. MERRYMAN:

15       Q.   Well, during your convers- -- she was right     01:57PM

16   next to you during the call; correct?

17       A.    Correct.

18       Q.   And was it your understanding, while you

19   were having the conversation with Time Warner Cable

20   on February 6, 2010, that Ms. Wells-Lipton could at      01:57PM

21   least hear your end of the conversation with the

22   company?

23           MR. GREIFINGER:  Calls for speculation.

24           THE WITNESS:   I believe she could hear my

25   end of the conversation.                                 01:57PM

**EXHIBIT Q**
**Page 433**

Page 110

```
 1      A.   Yes.

 2      Q.   Do you know anyone that has worked for Time

 3   Warner Cable at any time?

 4      A.   No.

 5      Q.   Are you aware of anyone that your brother      02:15PM

 6   knows who has worked at Time Warner Cable at any

 7   time?

 8      A.   No.

 9      Q.   Other than when you've called Time Warner

10   Cable's toll-free number, have you spoken to anyone    02:15PM

11   that works at Time Warner Cable?

12      A.   No.

13      Q.   Or that has worked at Time Warner Cable at

14   any time?

15      A.   No.                                            02:15PM

16      Q.   Have you made any strategic decisions

17   during the course of this litigation?

18           MR. GREIFINGER:   Objection, vague,

19   ambiguous.

20           THE WITNESS:   No.                             02:16PM

21   BY MR. MERRYMAN:

22      Q.   Do you rely on your attorneys to make

23   decisions regarding the litigation strategy in this

24   case?

25      A.   No.                                            02:16PM
```

**EXHIBIT Q**
**Page 434**

Page 111

1      Q.   Who makes the litigation strategy decisions

2   in this case?

3           MR. GREIFINGER:  Objection, vague,

4   ambiguous.

5           THE WITNESS:  Yeah, can you specify as to        02:16PM

6   what that means?

7   BY MR. MERRYMAN:

8      Q.   For example, you testified earlier you're

9   not aware of anything that's been filed with the

10  court; is that correct?                                 02:16PM

11     A.   That is correct.

12     Q.   So who has made the decisions to file

13  certain documents with the court if you haven't made

14  them?  Have your attorneys made those decisions?

15          MR. GREIFINGER:  Objection, calls for            02:16PM

16  speculation.

17          THE WITNESS:  I don't know.

18  BY MR. MERRYMAN:

19     Q.   Do you rely on your attorneys to keep you

20  informed regarding the status of the litigation?        02:17PM

21     A.   Yes.

22     Q.   Do you rely on your attorneys to make

23  decisions regarding litigation strategy?

24          MR. GREIFINGER:  If you und- -- answer --

25  if you don't understand the question, let him know.     02:17PM

**EXHIBIT Q**
**Page 435**

Page 112

1          THE WITNESS:  Yeah, can you define

2     "litigation strategy"?

3     BY MR. MERRYMAN:

4          Q.    Well, do you rely on your attorneys to

5     decide how best to pursue the case?                    02:17PM

6          A.    Again, I don't know what you mean by that.

7          Q.    Well, do you rely on your attorneys to

8     decide what to do next in the case?

9          A.    Yes.

10         Q.    And through today, have you relied on your    02:17PM

11    attorneys to pursue the case in the most beneficial

12    way possible for you and the proposed class?

13         A.    I don't know what you mean by that.

14         Q.    What have you done through today, other

15    than your meeting yesterday and coming to this          02:18PM

16    deposition, to proceed in this case in the best

17    possible way for the proposed class?

18         A.    I have -- that would be discussing what I

19    spoke with my attorneys about; right?

20         MR. GREIFINGER:  You're not to reveal              02:18PM

21    attorney-client communication.  If you've met with

22    us, you can state that, but don't state the content

23    of the meetings.

24         THE WITNESS:  Just the facts of the case.

25    BY MR. MERRYMAN:                                        02:18PM

**EXHIBIT Q**
**Page 436**

Page 113

1      Q.   So you gave your attorneys the facts

2  regarding your claim against Time Warner Cable;

3  correct?

4      A.   Correct.

5      Q.   And you met with your attorneys yesterday        02:19PM

6  to prepare for today's deposition; correct?

7      A.   Correct.

8      Q.   And you have attended this deposition

9  today; correct?

10     A.   Correct.                                          02:19PM

11     Q.   Other than those actions, what have you

12  done to prosecute this case on behalf of the

13  proposed class?

14     A.   That's it.

15     Q.   Other than those actions which you          02:19PM

16  described a moment ago, have you relied on your

17  attorneys to make decisions in moving the case

18  forward on behalf of the proposed class?

19     A.   Can you be more specific --

20     Q.   Well --

21     A.   -- as to what decisions?

22     Q.   To the extent anything's happened in the

23  case other than the three activities that you

24  described a moment ago, have you relied on your

25  attorneys to conduct those activities?            02:19PM

**EXHIBIT Q**
**Page 437**

Page 114

1        A.    Yes.

2        Q.    Directing your attention to Exhibit 1,

3   which is in front of you.

4              MR. MERRYMAN:   Let's mark as Exhibit 2 a

5   document.                                              02:21PM

6              (Deposition Exhibit 2 was marked for

7   identification.)

8   BY MR. MERRYMAN:

9        Q.    Have you seen Exhibit 2 before today?

10       A.    Yes.                                         02:21PM

11       Q.    Is that your signature about halfway down

12   on the right to the right of the name Miguel

13   Calzada?

14       A.    Yes.

15       Q.    And did you sign the verification marked as  02:21PM

16   Exhibit 2 yesterday on November 14, 2011?

17       A.    Yes.

18       Q.    And prior to signing the verification, did

19   you review Exhibit 1, the supplemental responses to

20   Defendant's first set of special interrogatories?      02:21PM

21       A.    Correct.

22       Q.    And did you review those interrogatories to

23   confirm that the information in them was accurate,

24   to the best of your knowledge?

25       A.    Yes.                                         02:21PM

**EXHIBIT Q**
**Page 438**

Page 117

1    words "Miguel Calzada"?

2        A.    Yes.

3        Q.    Do you recall the differences, if any,

4    between the responses to interrogatories and the

5    supplemental responses to interrogatories?            02:25PM

6        A.    Yes.

7        Q.    What were the differences?

8        A.    The responses were more vague, if I'm

9    remembering correctly.

10       Q.    What does that mean?                         02:25PM

11       A.    There was less information on the responses

12   to interrogatories than the supplemental.

13       Q.    In what respect was there less information?

14       A.    I don't remember specifically.

15       Q.    Can you remember anything at all that was   02:26PM

16   different about the two interrogatory responses?

17       A.    Specifically, no.

18       Q.    Prior to yesterday, had you seen the

19   complaint that was filed in this case?

20       A.    I don't recall.                             02:27PM

21       Q.    Do you know how many complaints have been

22   filed in this case?

23       A.    No.

24       Q.    Do you know whether an amended complaint

25   has been filed in this case?                          02:27PM

**EXHIBIT Q**
**Page 439**

Page 118

1       A.    No.

2       Q.    Did you review the complaint prior to its

3   being filed in this case?

4       A.    I don't know.

5       Q.    Do you know what the complaint is?          02:27PM

6       A.    I have a rough idea.

7       Q.    What's a complaint?

8       A.    The alleged -- is it like infractions?  Or

9   the alleged -- the events of the case and what rules

10  may have been broken.                                 02:28PM

11      Q.    Do you have an understanding that a

12  complaint is one of the documents that's filed to

13  start a case?

14      A.    Yes.

15      Q.    Did you review the complaint that was filed  02:28PM

16  to start this case before it was filed?

17      A.    Can you repeat that?

18      Q.    Did you personally review the complaint

19  that was filed to commence this case before the

20  complaint was filed with the court?                   02:29PM

21      A.    I do not remember.

22      Q.    Did you personally conduct any factual

23  investigation with respect to the claims in the

24  complaint prior to the filing of the complaint?

25      A.    Can you be more specific?                   02:29PM

**EXHIBIT Q**
**Page 440**

Page 119

1      Q.    Did you personally do anything to

2    investigate whether or not Time Warner Cable gives

3    notice that calls may be monitored or recorded prior

4    to filing the complaint?

5      A.    No.                                        02:30PM

6      Q.    Mr. Calzada, I'm going to hand you a

7    document that's been marked in the bottom right-hand

8    corner with the numbers TWC 01995 through -1997.

9          I'm not going to mark this right now.

10          I would like to direct your attention to    02:31PM

11    the second page, which is marked TWC 01996, and ask

12    if you recognize the signature in the upper third of

13    the page?

14      A.    I do not.

15      Q.    Would you recognize your brother Jaime     02:31PM

16    Calzada's signature if you saw it?

17      A.    I would not.

18      Q.    So it's your testimony that you do not

19    recognize the handwriting signature on

20    page TWC 01996 --                                02:32PM

21          MR. GREIFINGER:  Objection, asked --

22    BY MR. MERRYMAN:

23      Q.    -- is that correct?

24          MR. GREIFINGER:  Objection, asked and

25    answered.                                        02:32PM

**EXHIBIT Q**
**Page 441**

```
 1    STATE OF CALIFORNIA    ) ss:

 2    COUNTY OF LOS ANGELES )

 3

 4        I, JANICE SCHUTZMAN, C.S.R. No. 9509, do hereby

 5    certify:

 6        That the foregoing deposition testimony was

 7    taken before me at the time and place therein set

 8    forth and at which time the witness was administered

 9    the oath;

10        That the testimony of the witness and all

11    objections made by counsel at the time of the

12    examination were recorded stenographically by me,

13    and were thereafter transcribed under my direction

14    and supervision, and that the foregoing pages

15    contain a full, true and accurate record of all

16    proceedings and testimony to the best of my skill

17    and ability.

18        I further certify that I am neither counsel for

19    any party to said action, nor am I related to any

20    party to said action, nor am I in any way interested

21    in the outcome thereof.

22        IN WITNESS WHEREOF, I have subscribed my name

23    this 17th day of November, 2011.

24

25

                                          Page 126
```

**EXHIBIT Q**
**Page 442**

1

2

3

4        JANICE SCHUTZMAN, CSR No. 9509

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 127

**EXHIBIT Q**
**Page 443**

# EXHIBIT R

```
 1                  UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

 3         _____

 4      MIGUEL CALZADA,                   )

 5                                        )

 6           Plaintiff,                   )

 7                                        )

 8      vs.                               ) No. 2:11-cv-01701-DMG-JCG

 9                                        )

10      TIME WARNER CABLE, LLC,           )

11      and DOES 1 through 100,           )

12      inclusive                         )

13                                        )

14                                        )

15           Defendants.                  )

16      _____   )

17

18           DEPOSITION OF MARTIN PRUNTY was taken on

19      December 5, 2011, commencing at 11:14 a.m. at the law

20      offices of Steptoe & Johnson, 201 East Washington Street,

21      Suite 1600, Phoenix, Arizona, before YVONNE L. WHITEFIELD,

22      a Certified Court Reporter in the State of Arizona.

23      COUNSEL APPEARING:

24

25
```

**EXHIBIT R**
**Page 444**

Page 55

1       A.   Yes.

2       Q.   For how long have you been working with Avaya

3    ACDs?

4       A.   For as long as they've been around.

5       Q.   How long is that?                              12:42

6       A.   I couldn't tell you exactly, but when I first

7    started in -- they were still part of AT&T.  So they've

8    been through several iterations.  But I've been working

9    with them for a long time.

10      Q.   What has been your experience with Avaya ACDs?   12:43

11      A.   I think they're excellent products.

12      Q.   Why do you consider yourself an expert in IVR

13   systems?

14      A.   Same reason as ACD.  It's a very common

15   technology in call centers and contact centers and I      12:43

16   worked with them all the time.

17      Q.   Is there any specific brands of IVR systems that

18   you consider yourself to be an expert in?

19      A.   No.

20      Q.   Have you ever worked with a West Interactive IVR?  12:43

21      A.   I know I answered that one.  The answer is no.

22      Q.   Do you have any familiarity with the West

23   Interactive brand of IVR?

24      A.   I've not worked with them.

25      Q.   So you have not worked with West Interactive     12:44

**EXHIBIT R**
**Page 445**

Page 56

1     brands of IVR?  The answer is no, you don't have any

2     familiarity with them?

3         A.   I'm aware that they have an offering, but I'm not

4     familiar with the specifics of their offering.

5         Q.   So is that a no?                                    12:44

6         A.   That's a no.

7         Q.   Do you consider yourself an expert in

8     call-recording technology?

9         A.   Yes.

10        Q.   Why do you consider yourself an expert in          12:45

11    call-recording technology?

12        A.   Because I worked with a lot of it.

13        Q.   When you say worked with a lot of it, what type

14    of work have you done with call recording technologies?

15        A.   I've done many call center consulting engagements  12:45

16    for companies who use it and I have a strong understanding

17    of how they use it, how it works, what it's capable of

18    doing.

19        Q.   Have you ever set up a call recording system for

20    a company?                                                   12:45

21        A.   I'm not in the business of setting up call

22    recording.

23        Q.   I believe you testified earlier that you have

24    experience with Witness brand of call-recording

25    technology?                                                  12:45

Page 57

1       A.    Not in setting it up.  Yes, I've worked with it.

2       Q.    You've worked with it?  What type of work have

3    you done with Witness technology?

4       A.    I worked with clients who used Witness

5    technology.                                              12:46

6       Q.    Have you ever yourself worked with Witness's

7    system?

8       A.    What do you mean by that?

9       Q.    Have you ever had access to Witness's system to,

10   for example, monitor a call?                             12:46

11          MR. OZZELLO:  Vague and ambiguous.

12          THE WITNESS:  Yeah.  I'm not sure I understand

13   the question.

14   BY MS. FELDMAN:

15       Q.    Other than working with a company who has       12:46

16   Witness, what have you done specifically with regard to

17   Witness technology?

18          MR. OZZELLO:  Vague and ambiguous.

19          THE WITNESS:  Yeah.  When you say work with the

20   technology, I work with the client to better utilize the  12:46

21   technology.  I don't program it; I don't --

22          MR. OZZELLO:  There's no question pending.

23          THE WITNESS:  Okay.

24   BY MS. FELDMAN:

25       Q.    Have you ever used Witness to monitor a call     12:46

**EXHIBIT R**
**Page 447**

Page 58

1   that's been recorded?

2          MR. OZZELLO:  Vague and ambiguous.

3          THE WITNESS:  I don't use -- I don't monitor

4   calls.

5   BY MS. FELDMAN:                                    12:47

6       Q.   Have you ever used Witness to search for a call

7   that's been recorded?

8       A.   No.

9       Q.   Have you ever ran a test on a system to insure

10  that Witness was working correctly?                 12:47

11      A.   No.

12      Q.   In general, what has been your experience with

13  the Witness technology?

14          MR. OZZELLO:  Vague and ambiguous.

15          THE WITNESS:  My exposure to it has been good.  12:47

16  BY MS. FELDMAN:

17      Q.   Do you make recommendations to companies as to

18  how to use the Witness technology?

19      A.   Not specifically, no.

20      Q.   What is your understanding as to how Witness    12:48

21  works?

22      A.   Witness is interconnected to the ACD system and

23  it's preprogrammed to record some or all calls, incoming

24  or outgoing.  And it gives the user the ability to search

25  on calls, to manage the quality for the agent, and to    12:48

**EXHIBIT R**
**Page 448**

Page 107

1    that it does happen and reviewing, you know, testimony

2    from the person most knowledgeable.

3        Q.   In reviewing the trouble tickets and the other

4    documents you just mentioned, did you find any evidence to

5    support that Mr. Calzada did not receive notice his call        02:49

6    was being recorded on February 6?

7        A.   That wasn't my purpose.

8        Q.   So is that a no?

9        A.   That's a no.

10       Q.   Did you find any evidence in reviewing documents      02:49

11   for this case that Time Warner wasn't providing notice on

12   more than one occasion?

13           MR. OZZELLO:  Vague and ambiguous.

14           THE WITNESS:  There's no way to describe that

15   it's one occasion.  It's very possible that on those            02:49

16   numbers, in particular the VDNs that were shown, they may

17   never have had a recorded message provided, recorded

18   announcement.

19   BY MS. FELDMAN:

20       Q.   When you say "very possible," what do you mean?        02:50

21       A.   What I mean is that there are -- there were 26

22   VDNs that do not have a -- were not -- were not providing

23   callers with an announcement.  That's 26 telephone numbers

24   associated with that.

25           And what's not known is what caused that or how        02:50

**EXHIBIT R**
**Page 449**

Page 108

1    long it had been in place.  In my view, the most likely

2    possibility is they were never programmed properly to

3    begin with.

4        Q.   Why is it your view that is the most likely

5    possibility?                                          02:50

6        A.   Because it's unusual for somebody to go in and

7    change vectors once they're established and to

8    specifically remove a recorded announcement from those

9    vectors.

10       Q.   What evidence do you have to support that it was   02:50

11   likely that those VDNs were never programmed to provide

12   notice to callers that their call --

13       A.   I don't have evidence for that, but I haven't

14   seen any evidence that suggests anything else.

15       Q.   I think a second ago, you said 26 VDNs refers to   02:51

16   26 telephone numbers.  Is it your opinion that each VDN,

17   in other words -- strike that.

18            Would 888-TW-CABLE be one VDN?

19       A.   Generally that's how it works.

20       Q.   So then when you say --                        02:51

21       A.   Could be a local or toll-free number.

22       Q.   In your opinion, 26 VDN is 26 separate telephone

23   numbers dialed by callers to reach Time Warner Cable?

24       A.   Typically that's the way it works.

25       Q.   We'll come back to this issue later.          02:51

**EXHIBIT R**
**Page 450**

Page 120

1     A.   Myself basically.  I would say myself and the

2   attorneys.

3     Q.   What specific evidence do you believe clearly

4   substantiates that all California callers to TWC did not

5   receive notice that their calls may be recorded?        03:23

6     A.   If you reference Exhibit B, this is excerpts from

7   the trouble tickets and CR No. 766 and 771.  766 dated

8   9-24, it's indicating "Insert pre-queue announcement onto

9   VDNs in Pacific ACD-San Diego; customers will not" --

10  "will continue to not hear the announcement; therefore, we  03:23

11  are not in compliance."

12          And then under WOM notes, "pre-queue announcement

13  informing callers of recorded calls is missing out of

14  compliance."

15    Q.   And how did this document clearly substantiate   03:24

16  that all California callers to TWC were not receiving

17  notice that their calls may be recorded or monitored?

18    A.   It doesn't.  It certainly proves that some were

19  not.

20    Q.   Other than this one example in Exhibit B, did you  03:24

21  find any other evidence that TWC was not giving notice to

22  callers that their calls might be recorded or monitored?

23    A.   No.

24    Q.   Paragraph 16 states "clearly substantiates its

25  position that some or all California callers."          03:24

**EXHIBIT R**
**Page 451**

Page 121

1        What evidence do you have that all California

2    callers within the State of California were not receiving

3    a recorded announcement notifying them that their calls

4    may be recorded or monitored?

5        A.   I don't.  The intent of this was, however, to        03:25

6    point out that Mr. Shimonovitz basically said that none

7    were not giving that message.  And what I think this

8    clearly indicates is that he was incorrect, and that there

9    are calls that are not being -- callers were not receiving

10   that notification.                                            03:25

11        My suggestion, my intent in the way this was

12   worded was to suggest that there may be more information

13   to be found, but this is information clearly that suggests

14   that all were not given pre-recorded announcements.

15        Q.   I move to strike everything after you answered     03:25

16   the question "I don't."

17        How do you think this one example clearly

18   substantiates that all of California callers were not

19   receiving notice that their calls might be recorded or

20   monitored?                                                    03:26

21        A.   It doesn't.

22        Q.   Do you know whether the callers that you contend

23   did not receive notice that their calls might be recorded

24   or monitored actually had their calls recorded?

25        A.   I don't, but it would be easy to find out.          03:26

**EXHIBIT R**
**Page 452**

Page 129

1      Q.    Do you know --

2      A.    That information is not available to me.

3      Q.    Turning to Exhibit B of your expert report, did

4    you prepare this document?

5      A.    Let me catch up.  You're referring to the          03:35

6    excerpts?  Yes, I did.

7      Q.    Do you agree these excerpts are from a document

8    produced by TWC Bates labeled TWC-019777 -- 1977.  Sorry.

9      A.    Yes.

10      Q.    You agree that this is the data from CR No. 766     03:36

11    and 771 which were rows 114 and 115 of that report?

12      A.    Correct.

13      Q.    Did you review TWC 1977 in its entirety?

14      A.    I did.

15      Q.    Do you know who created TWC 1977?                   03:36

16      A.    I would have to go back and look.

17      Q.    Do you know how it was created?

18      A.    I would have to go back and look.

19      Q.    As you sit here today, do you know how TWC 1977

20    was created?                                                03:36

21      A.    It was created by your -- as I recall, it was

22    something that was provided in discovery by your person

23    most knowledgeable, Sagi Shimonovitz.

24      Q.    Do you know the purpose of TWC 1977?

25      A.    It's a spreadsheet that chronicled all trouble      03:37

Page 130

1    tickets relating to Avaya during the class period.

2         Q.    How do you know this?

3         A.    I believe that's what was said in testimony.

4         Q.    By what was said in the testimony, which

5    testimony in the testimony?                                   03:37

6         A.    Shimonovitz.

7         Q.    Do you agree this data is from a tab on TWC 1977

8    entitled CM data?

9         A.    Uh-huh.

10        Q.    What does CM data mean?                             03:37

11        A.    I couldn't tell you off the top of my head.

12        Q.    Do you agree that Exhibit B are just excerpts

13   from CR 766, 777 and that there are additional columns

14   that are not represented?

15        A.    Absolutely.  My intent in creating this was not    03:38

16   to try to duplicate the trouble ticket itself.  It was

17   just to pull highlights out of it.

18        Q.    How did you choose which columns to include in

19   this exhibit and which not to include?

20        A.    I picked the ones that I thought were relevant to  03:38

21   the problem, described the problem and described what was

22   being done with it.

23             MS. FELDMAN:  I would like to mark as Exhibit 2 a

24   diagram.

25   ///                                                           03:39

**EXHIBIT R**
**Page 454**

Page 131

1              (Deposition Exhibit Number 2 was marked for

2              identification.)

3    BY MS. FELDMAN:

4         Q.    Mr. Prunty, do you agree the document marked as

5    Exhibit 2 contains the same data as Exhibit B to your              03:39

6    declaration but also includes the columns you did not

7    include in Exhibit B?

8         A.    I would have to look at the original spreadsheet

9    to verify that.  It does include more columns.

10        Q.    Do you have any reason to believe that this is       03:39

11   not an accurate printout of rows 114 and 115 from TWC

12   1977?

13        A.    I don't.  I just answered your question, though.

14        Q.    Have you talked to anyone at Time Warner Cable to

15   help interpret Time Warner Cable -- TWC 01977 for you?           03:39

16        A.    No, I have not.

17        Q.    Aside from what is listed in Exhibit B to your

18   declaration and here in Exhibit 2, does Time Warner Cable

19   1977, do you have any independent knowledge of the alleged

20   issues identified as CR 766 and 771?                             03:39

21        A.    Could you ask that again, please?

22        Q.    Is your knowledge of 766 and 771 limited to your

23   interpretation of what is in this report?

24        A.    Yes.

25        Q.    In your opinion, what's the difference between       03:40

Page 146

1    To what do you think validation date refers?

2        A.   I couldn't tell you in this context.

3        Q.   Could validation mean the date they validated

4    that the test had been done and met?

5        A.   I wouldn't conclude that.                      03:58

6        Q.   Is it possible that validation -- looking at this

7    report, do you know how many callers allegedly did not

8    receive notice that their calls were being recorded as a

9    result of CR 766 and 771?

10       A.   No, but that information is available.         03:58

11       Q.   From looking at this report, can you tell how

12   many callers were impacted by the alleged issue in 766 or

13   771?

14       A.   I just know that there was one.

15       Q.   As you sit here today, do you know how many     03:59

16   callers were allegedly impacted by the problems addressed

17   in 766 and 771?

18       A.   Of course not, but depending upon the telephone

19   numbers assigned to the VDNs, it could be a large number.

20       Q.   I believe you testified earlier that you don't  03:59

21   know how many VDNs there were for San Diego callers; is

22   that correct?

23       A.   That's correct.

24       Q.   Do you know how many total VDNs there were at the

25   time for California callers?                            03:59

**EXHIBIT R**
**Page 456**

Page 148

1    approximately what percentage of calls relate to a billing

2    issue?

3        A.    There's no way to answer that.

4        Q.    Have you ever done research to determine the

5    percentage of calls that relate to different topics for a      04:01

6    call center?

7        A.    Yes.

8        Q.    Have you ever done that research in the context

9    of a cable company?

10       A.    No.                                                   04:01

11       Q.    Moving on to the next paragraph, paragraph 18 of

12   your report, on what do you base your opinion that the

13   problems identified in CR 766 and 771 were eventually

14   corrected on October 6, 2010?

15       A.    The trouble ticket.                                   04:01

16       Q.    How did the trouble ticket form your opinion that

17   the issues identified in CR 766 and 771 were corrected on

18   October 6, 2010?

19       A.    By the entry date closed of 10-6-2010, which is

20   the second to last column of CR 771.                           04:02

21       Q.    Do you know for certain that 10-6-2010 refers to

22   the date that the issues in 766 and 771 were resolved?

23       A.    I can tell you that in trouble-ticket reporting,

24   that's what it would mean.  But I can't imagine it meaning

25   anything else.  Let's put it that way.                         04:03

**EXHIBIT R**
**Page 457**

Page 149

1       Q.    Is it possible that the date 10-6-2010 refers to

2   the date the ticket was closed?

3       A.    It's normally not how it's done.

4       Q.    When you say normally not how it's done, are you

5   referring to generally or to Time Warner Cable's practices    04:03

6   for filling out trouble tickets?

7       A.    Generally.

8       Q.    Do you know whether in Time Warner Cable's

9   practices for filling out trouble tickets "date close"

10  refers to the date that the ticket is actually closed as      04:03

11  opposed to the date that the change is made?

12      A.    I do not know that.

13      Q.    Do you agree that the date listed for both 766

14  and 771 in the column change date is September 24, 2010?

15      A.    I'm sorry.  Repeat that, please.                    04:03

16      Q.    Looking to the column "change date."  It's on the

17  first page, the fifth column.  Do you agree that the date

18  listed there is September 24, 2010?

19      A.    Yes.

20      Q.    And at the very end of that page, do you agree     04:04

21  that the review date listed in 766 and 771 is

22  September 24, 2010?

23      A.    Yes.

24      Q.    Turning to the next page under "validation date,"

25  do you agree that the validation date for both 766 and 771   04:04

**EXHIBIT R**
**Page 458**

Page 154

1    interpretation of that report is incorrect, do you have

2    any evidence that Time Warner Cable did not give notice to

3    callers that their calls might be recorded from January

4    27, 2010 to the present?

5           MR. OZZELLO:  Incomplete hypothetical.                    04:09

6           THE WITNESS:  It's a difficult question.  The

7    answer is probably no to your question.

8    BY MS. FELDMAN:

9       Q.   Turning back to your report in the last sentence

10   of paragraph 18, you say "Therefore, it is very likely        04:10

11   that the problem existed for a much longer period than the

12   13 days that transpired from the time the problem was

13   first reported until it was resolved."

14          In that context, what is the magnitude of "very

15   likely"?                                                        04:10

16          MR. OZZELLO:  Vague and ambiguous; asked and

17   answered.

18          THE WITNESS:  You waiting for a response?

19   BY MS. FELDMAN:

20      Q.   Yes.                                                    04:10

21      A.   Why is it very likely?  Essentially if you

22   interpret -- if you evaluate the deposition of the person

23   most knowledgeable who states categorically that there are

24   no callers who do not get a message, a recorded

25   announcement.  Essentially I'm paraphrasing what he said,      04:11

**EXHIBIT R**
**Page 459**

Page 155

1   but that's essentially what he said.

2          And then you see this and you realize that there

3   was no process in place to specifically to check to make

4   sure that every call received that message, and when you

5   realize that there's nothing that alarms or, you know,        04:11

6   notifies people that there is -- the recorded message is

7   working, they have to find it out themselves.

8          My belief is that the likelihood is it happened

9   much earlier than 9-24, but that's the date that they

10  found it or they discovered it.                               04:12

11         That's my speculation.

12     Q.   That's your speculation based on your review of

13  this single report, correct?

14     A.   And the testimony of the person most

15  knowledgeable.                                                04:12

16     Q.   Is there anything in this report to indicate that

17  callers in Los Angeles were not receiving notice that

18  their calls might be recorded on May 27, 2009?

19         MR. OZZELLO:   Which report?

20         MS. FELDMAN:   1977.                                   04:12

21         MR. OZZELLO:   Vague and ambiguous.

22  BY MS. FELDMAN:

23     Q.   Is there anything in TWC 1977 to indicate that

24  callers in Los Angeles were not receiving notice that

25  there calls might be recorded on May 27, 2009?               04:12

**EXHIBIT R**
**Page 460**

Page 158

1        A.    Yes.

2        Q.    Turning to page or paragraph 23 of your

3    declaration, on what do you base your opinion that it is

4    very likely that other local or toll-free numbers do not

5    receive the required pre-recorded announcement?          04:38

6        A.    I concluded from my evaluation of the deposition

7    of Sagi Shimonovitz that there didn't seem to be a process

8    in place for checking specifically for messages -- for

9    these recorded announcements.

10           And, therefore, I felt that being in the position   04:38

11   that he was and taking the position that he did, that

12   there were none, and finding them led me to believe that

13   it would be worthwhile to look at the others to see if

14   there were others like that.

15       Q.    Have you come across a specific toll-free number   04:38

16   that you contend does not give callers notice that their

17   calls might be recorded or monitored?

18       A.    No.   No, I have not.

19       Q.    Do you know any toll-free number or local number

20   during the class period that callers called and did not    04:39

21   receive notice that their calls might be monitored or

22   recorded?

23       A.    Not with the information I have available, no.

24       Q.    Paragraph 24 of your declaration, you state that

25   there is a method that exists to identify the specific     04:39

**EXHIBIT R**
**Page 461**

1    class-wide basis?

2          MR. OZZELLO:  Asked and answered.

3          THE WITNESS:  I would have to decide.  I don't

4    have any idea at this point how many calls are involved in

5    this because we don't have that information.                    05:00

6    BY MS. FELDMAN:

7      Q.   Would you agree that you would have to track that

8    on a call-by-call basis?

9      A.   No, I wouldn't.

10     Q.   As you sit here today, you don't know how you       05:00

11   would track that on a class-wide basis?

12     A.   I don't think I have enough information to do

13   that.  I think there are ways it can be done without going

14   call-by-call, however.  I would have to decide how that

15   happens.                                                       05:00

16     Q.   Do you know whether TWC has technology in place

17   that would let you do that on a class-wide basis?

18     A.   I don't.

19     Q.   Turning to paragraph 27 of your declaration, have

20   you ever used the Verint ContactStore for Communications    05:01

21   Manager?

22     A.   I would have no reason to.

23     Q.   Have you ever used the bulk-search capabilities

24   on Verint?

25     A.   No, I have not.                                        05:01

**EXHIBIT R**
**Page 462**

Page 175

1    Q.   Have you ever conducted a search on Verint for a

2    specific VDN?

3    A.   No, I have not.

4    Q.   Aside from your review of the Verint guide that

5    you referenced in this paragraph, have you conducted any          05:01

6    test of TWC's system to determine whether Verint is

7    searchable by VDN?

8    A.   No, I have not.

9    Q.   Aside from your review of the Verint guide

10   referenced in this paragraph, did you conduct any test of         05:02

11   TWC's system to determine whether Verint is searchable by

12   calls that are answered without receiving a recorded

13   announcement?

14   A.   No.

15   Q.   Aside from your review of the Verint                         05:02

16   administrative guide, what is the basis for your opinion

17   in paragraph 27?

18   A.   The Verint ContactStore for Communications

19   Manager manual is what I relied upon, and it states

20   specifically that is something that could be done.                05:03

21   Q.   Is there anything else that you relied on for

22   your opinion in paragraph 27 other than the manual?

23   A.   No.

24   Q.   Paragraph 29, you reference an internal TWC

25   e-mail.  To what e-mail are you referring?                        05:03

Page 176

1        A.    I'm trying to recall whether I had seen the

2   e-mail or whether I was -- I had discussed this with one

3   of the plaintiff attorneys.   There evidently was an

4   internal TWC e-mail and I don't know that I had a copy of

5   it myself that referenced to TWC's practice of recording          05:04

6   both incoming and outgoing calls.

7              It might have also been -- it might either have

8   been in that context or from the Shimonovitz deposition.

9   I don't recall.

10       Q.    Aside from learning about this e-mail, what other       05:04

11  evidence did you consider concerning Time Warner Cable's

12  outgoing call recording policies?

13       A.    I had none.

14       Q.    Do you know generally what TWC's policy is for

15  recording outgoing calls?                                          05:04

16       A.    No, I do not.

17       Q.    Do you know what technology TWC uses to allegedly

18  record outgoing calls?

19       A.    I don't know specifically.   In all likelihood,

20  it's the same Verint system or Witness system.   It also          05:05

21  depends on whether it's one of the outsourcers or not

22  because they're using different systems.

23       Q.    So as you sit here today, you don't know one way

24  or the other which technology TWC uses to allegedly record

25  calls?                                                             05:05

**EXHIBIT R**
**Page 464**

Page 178

1    their call was being recorded?

2         MR. OZZELLO:  Asked and answered.

3         THE WITNESS:  Yeah.  No, I haven't.

4    BY MS. FELDMAN:

5         Q.   Are you aware of anybody who received a call from    05:06

6    Time Warner Cable but did not receive notice that their

7    call was being recorded?

8         A.   No, I've not.

9         Q.   What steps have you taken to test or review Time

10   Warner Cable's outgoing-call policies?    05:07

11        A.   I have not.

12        Q.   Turning to paragraph 33 of your declaration, on

13   what do you base your opinion that Time Warner's outgoing

14   calls are typically stored and archived -- strike that.

15        On what do you base your opinion that calls are    05:08

16   typically stored or archived on a server?

17        A.   That's normally how it works.

18        Q.   Do you know TWC's policies for storing or

19   archiving outgoing-call recordings?

20        A.   I didn't say that.  I said they typically are.    05:08

21        Q.   Do you know specifically Time Warner Cable's

22   policy for storing or archiving outgoing-call recordings?

23        A.   I do not.

24        Q.   Do you know whether Time Warner Cable records

25   outgoing calls individually?    05:08

**EXHIBIT R**
**Page 465**

Page 179

1      A.    I do not.

2      Q.    Do you know in what format Time Warner Cable

3   stores outgoing calls?

4      A.    I'm not sure I understand what you mean.

5      Q.    Do you know in what file format Time Warner Cable     05:08

6   stores outgoing calls?

7      A.    I don't.  It would be one of several, but I don't

8   know specifically.

9      Q.    Do you know what technology Time Warner Cable

10  uses to store outgoing-call recordings?                        05:09

11     A.    No, I do not.

12     Q.    Do you agree that the only way to determine

13  whether Time Warner Cable gave notice to a specific caller

14  that has called was recorded or monitored would be to

15  record or -- would be to review the call recording for       05:09

16  that specific call?

17     A.    Please restate that.

18        MR. OZZELLO:  Asked and answered.

19  BY MS. FELDMAN:

20     Q.    Do you know of a methodology by which to identify    05:09

21  on a class-wide basis California residents whose calls are

22  recorded but who did not receive notice between January

23  27, 2010 and the present for outgoing calls?

24     A.    It is possible, and I don't know the answer to

25  this specifically, but if some of the recording systems      05:09

```
 1        Based on your review of TWC 1977 to date, or your

 2   review of any document in this case, aside from the

 3   situation in TWC -- CR 766 and 771, have you found any

 4   other examples that Time Warner Cable was not providing

 5   notice to callers that their calls may be monitored or     05:20

 6   recorded?

 7        MR. OZZELLO:  Lacks foundation; vague and

 8   ambiguous.

 9        THE WITNESS:  The qualifying point being of what

10   I have looked at, which is only a portion of the document,  05:20

11   I have not, but I'm not going to suggest that I searched

12   the entire document and found none because I didn't do

13   that.

14   BY MS. FELDMAN:

15        Q.   You've opined here that there is a significant     05:20

16   gap between the defendant's assertion that every caller

17   receives a recording notification message and the actual

18   reality.  Is that determination based solely on

19   Mr. Shimonovitz' deposition and what you located in 766

20   and 771?                                                     05:20

21        A.   Absolutely.  Yeah.

22        Q.   In your opinion does the error -- strike that.

23        Moving to paragraph 32, you testify that it's

24   highly likely that full compliance with the requirement to

25   provide notice of recording does not occur with outgoing     05:21
```

Page 187

1    calls.

2              On what do you base that opinion?

3              MR. OZZELLO:  Asked and answered.

4              THE WITNESS:  Yeah.  In most cases, it's done

5    manually, verbally.  And that's not nearly as easy to          05:21

6    manage as the incoming call.

7    BY MS. FELDMAN:

8         Q.   Have you seen any specific evidence to indicate

9    that Time Warner Cable is not giving notice on outbound

10   calls that calls might be recorded or monitored?            05:21

11        A.   Not based on what I've reviewed.

12        Q.   Then on what do you base your opinion?

13   Mr. Prunty, we discussed earlier your proposed method for

14   identifying callers who contacted TWC and did not receive

15   notice that their call was being recorded.                    05:23

16              How would you identify callers who allegedly did

17   not receive such notice and then were transferred to an

18   outside vendor; how would you determine whether their

19   calls were recorded?

20              MR. OZZELLO:  Incomplete hypothetical.            05:23

21              THE WITNESS:  There's lots of different ways.

22   Let me make sure I understand your question.  If the call

23   came into TWC and then was routed to an outsourcer?

24   BY MS. FELDMAN:

25        Q.   If a caller contacted Time Warner Cable, did not    05:23

**EXHIBIT R**
**Page 468**

Page 202

1          I HEREBY CERTIFY that the foregoing deposition

2    was taken by me pursuant to Notice; that I was then and

3    there a Certified Court Reporter for the State of Arizona,

4    and by virtue thereof authorized to administer an oath;

5    that the witness before testifying was duly sworn by me to

6    testify to the whole truth and nothing but the truth;

7    pursuant to request, notification was provided that the

8    deposition is available for review and signature; that the

9    questions propounded by counsel and the answers of the

10   witness thereto were taken down by me in shorthand and

11   thereafter transcribed through computer-aided

12   transcription under my direction, and that the foregoing

13   typewritten pages contain a full, true, and accurate

14   transcript of all proceedings had upon the taking of said

15   deposition, all done to the best of my skill and ability.

16          I FURTHER CERTIFY that I am in no way related to

17   nor employed by any of the parties hereto, nor am I in any

18   way interested in the outcome hereof.

19          DATED at Phoenix, Arizona, this 7th day of

20   December, 2011.

21

22

23

24          YVONNE WHITEFIELD
            Certified Court Reporter
25          Certificate No. 50611

**EXHIBIT R**
**Page 469**

December 10, 2011

*Via U.S. Mail & E-mail*
*bmerryman@whitecase.com*

Bryan A Merryman, Esq.
**WHITE & CASE, LLP**
633 West 5th Street, Suite 1900
Los Angeles, California 90071-2007

   *Re: Calzada v. Time Warner Cable LLC*

Dear Mr. Merryman:

  Enclosed please find Martin Prunty's signed page of his deposition transcript taken on December 5, 2011.  Mr. Prunty's changes to his deposition transcript are as follows:

| <u>Page</u> | <u>Line</u> | <u>Change:</u> |
|---|---|---|
| 108 | 24 | VDNs are normally associated with incoming local or toll-free telephone numbers.  They are also used to route callers from an IVR to a vector in the ACD system. |
| 122 | 6-18 | First, I would conduct a search of the VDNs identified in CR# 771 in spreadsheet document 1977 using the Verint call recording system.  Then, I would conduct a review of all Avaya vectors to determine if call recording announcements were given in every case.  If I discovered vectors that excluded call recordings, I would conduct a search of the VDNs associated with the vectors using the Verint system. |
| 129 | 14 | No, I reviewed it long enough to discover CR#766 and 771. |
| 162 | 21 | I don't, but their technology is capable of capturing this data and it is highly-likely that they do. |
| 162-163 | 25-2 | It is very unlikely that TWC does not capture this data.  However, I do not know how they would capture it in |

**EXHIBIT R**
**Page 470**

Bryan A Merryman Esq.
December 12, 2011
Page 2

|  |  | response to your hypothetical question. |
|---|---|---|
| 167 | 15-17 | Yes.  The Verint call recording system captures both the VDN and the telephone number of the caller for each recorded call.  It is also capable of capturing the name of the caller for both toll-free and local numbers.  It captures the date and time of each call.  By knowing which VDN was used, you can also easily track whether the vector associated with it was providing the announcement notifying callers that their call would be recorded, or not.  Using the "Bulk Search and Replay" capabilities of the Verint system, each of the appropriate calls, and the information regarding the identity of who placed them, can easily be identified. |
| 174 | 3-5 | As I had previously described, the Verint call recording system can be used to search to find all calls during the class period that used a specific VDN, a vector that did not include a recorded announcement and the telephone number of each of the callers. |
| 174 | 12-15 | The Verint call recording system can be used to search to find all calls during the class period that used a specific VDN, a vector that did not include a recorded announcement and the telephone number of each of the callers. |
| 179-180 | 24-3 | Yes, an effective method for identifying outbound callers who did not receive a notice of recording would be to utilize forensic audio search technology, which is capable of identifying the presence or absence of words such as "this call may be recorded" in a batch of audio files.  Forensic audio search technology can be used to determine whether some or all of the outgoing call recording files contained key words used to provide notification that a call may be recorded. |
| 180 | 9-17 | I am referring to forensic audio search technology.  Forensic audio search technology can be used to determine whether some or all of the outgoing call recording files contained key words used to provide notification that a call |

**EXHIBIT R**
**Page 471**

Bryan A Merryman Esq.
December 12, 2011
Page 3

|   |   | may be recorded. |
|---|---|---|
| 180 | 21-22 | All outgoing audio files for the class period can be searched using forensic audio search technology for the period of the class action.  A third-party forensic audio search vendor can be retained to conduct the search and can access TWC audio files remotely. |
| 181 | 10-16 | I was only proposing to take a sample as a means of determining whether all outgoing callers were receiving consistent notification that calls are recorded.  In order to establish the impact on a class-wide basis, it will be necessary to conduct a forensic audio search on all outgoing calls. |
| 183 | 5-9 | I would be able to search all calls by using forensic audio search technology.  By entering key words, such as "recorded," this technology will identify every outgoing audio file where that word exists, or it may identify every audio file where that term does not exist.  Forensic audio search technology will simply the effort to identify class members relating to outgoing calls. |
| 183 | 16-18 | There are several options available, but Nexidia's Audio Discovery on Demand would serve as an example. |
| 189 | 8-9 | To make this determination, you would need to review the outside vendor's VDNs and vectors to determine whether or not a recorded message is given.  If it is determined that the vendor is not providing an a recording announcement, the vendor's recording system can be searched to find the appropriate calls in the same way as it happens with TWC's system. |
| 189 | 15-18 | Yes, it is essentially the same methodology that we used to determine TWC's failure to do so. |
| 189 | 25 | Yes, we would use the same methodology we have used with TWC. |
| 196 | 16-17 | Another way to identify Mr. Calzada would be from the |

**EXHIBIT R**
**Page 472**

Bryan A Merryman Esq.
December 12, 2011
Page 4

recording itself.  There may be other ways to identify Mr. Calzada in this instance.  However, more discovery of the TWC technology and customer database is necessary to make that determination.

197        6        Mr. Calzada's cell phone number would be captured by the Avaya system and would also be stored as part of the recording database in the Verint recording system.

Should you have any questions, please do not hesitate to contact our office at your earliest convenience.

Very truly yours,

ARIAS OZZELLO & GIGNAC LLP

ASHLEY HART

**EXHIBIT R**
**Page 473**

Page 201

1          THE VIDEOGRAPHER:  This concludes the

2     deposition --

3          MS. FELDMAN:  Can we go off the record?

4          THE VIDEOGRAPHER:  Yes.  Certainly.  Off the

5     record at 5:59.                                    05:59

6          (Recess taken.)

7          THE VIDEOGRAPHER:  This concludes the deposition

8     of Martin Prunty.  Off the record at 6:03.

9          MS. FELDMAN:  We're going to stipulate to relieve

10    you of the duties under federal rules.  Mr. Prunty has    06:03

11    agreed to provide -- review his deposition and provide

12    comments to his counsel by Friday.  And Mr. Ozzello has

13    agreed to provide us by noon on Saturday any changes

14    Mr. Prunty has and a signed deposition.

15          MR. OZZELLO:  So agreed.                       06:04

16          (Whereupon, the deposition concluded at

17          6:04 p.m.)

18

19

20          _____

21                MARTIN PRUNTY

22

23

24

25

**EXHIBIT R**
**Page 474**